AND

## THE CORRECTION OF ERRORS,

OF THE

## STATE OF NEW-YORK,

IN APRIL, 1824.

---

WILLIAM SEYMOUR, appellant,
*against*
THOMAS J. DELANCY and others, respondents.

Whether a court of chancery shall decree the specific performance of an agreement, or not, is a matter resting in its discretion; but this is a sound legal discretion.

The party claiming performance must present a case fair, just and reasonable; the contract to be performed must have been entered into upon adequate consideration; and must be free from fraud, misrepresentation or surprise; and it must not be hard, unconscionable, or unequal.

Where the inadequacy of price, in a contract to sell or convey, is so inadequate as to be conclusive evidence of fraud, as where it would shock the moral sense of an indifferent man, a court of chancery should not carry it into effect.

But inadequacy of price, merely, without being such as to prove fraud conclusively, the contract being entered into deliberately, and fair in all its parts, is not an objection to its being executed.

The cases upon this point of mere inadequacy cited, and the substance of them stated in chronological order, per SAVAGE, Ch. J.

A court of chancery requires stronger reasons for setting aside an agreement, or delivering it up to be cancelled, than would be sufficient to warrant denying a specific performance.

Seymour
v.
Delancy.

So a court of chancery will, in many cases, not disturb an agreement exe‑ cuted, though it might have denied a specific performance.

It will order an agreement to be delivered up to be cancelled, for fraud, circumvention, or misrepresentation.

*Drunkenness.* Cases cited by counsel, upon the question, how far this shall operate as a defence against a bill for the specific performance of a contract.

On a bill filed by the vendor, to compel a specific performance, it is suffi‑ cient, if he can make a good title at the time of the decree, unless he has been quickened by the vendee, or time be of the essence of the contract ; as where it relates to stocks or personal chattels.

It is, in general, no objection, that the vendor's remedy is gone at law, by reason of there being a mortgage on the estate, &c. so that he could not convey a good title at the day fixed upon by the contract.

Cases to this point cited in their chronological order, per SAVAGE, Ch J.

It is the peculiar province of courts of equity, to interfere, where the rem‑ edy is defective at law, if such interference be not against conscience.

ON appeal from the Court of Chancery. On the 14*th* *March*, 1821, the appellant filed his bill in the Court of Chancery, against the respondents, the real and personal representatives of *Thomas Ellison*, deceased, to compel the specific performance of articles of agreement made between the appellant and *Thomas Ellison*, in his life time, dated *Jan.* 14*th*, 18.0, by which *Ellison* covenanted that he would, on, or before the 1*st* day of *June*, 1820, convey to the appel‑ lant, in fee, a certain lot, situate in the town of *Montgomery*, and another lot situate in the town of *Walkill*, both in the county of *Orange*, with covenants for quiet enjoyment, and against incumbrances ; also, with covenants of seisin and warranty, and for further assurance : in consideration of which premises, the appellant covenanted that he would, on, or before the 1*st* day of *June*, 1820, convey to *Ellison*, in fee, the one equal undivided third part of two lots in the village of *Newburgh*, in *Orange* county, with a stipulation that each might enter into immediate possession of the premises so to be conveyed to him, and have and receive the profits to his own use. The parties, shortly after, took possession ac‑ cordingly, which had continued to the time of filing the bill.

The bill stated that the appellant had always been ready to execute a conveyance, according to his covenant; but set up, as an excuse for not having done it in *Ellison's* life

time, that he was, for several months previous to his death, which happened *August 3d*, 1820, incapable of business; that some of his heirs were infants, and, therefore, incapable of executing the contract.

The grounds of defence insisted upon by the answer were, 1. That, before the articles were executed, the appellant had conveyed some part, or the whole of his right in the *Newburgh* lots, to his sister, *Esther Seymour*, and that his title was very questionable: 2. That the bargain or agreement, as contained in the articles, was a most unconscionable one, on the part of the appellant, inasmuch as the lots in *Montgomery* and *Walkill* exceeded the value of the *Newburgh* lots several thousand dollars: 3. That the appellant could not, during the life time of *Ellison*, have made a good title to the *Newburgh* lots; for that, independent of the questions which existed in relation to the title when the articles were executed, and which remained at the time of the answer, the appellant and his wife had mortgaged these premises to *Thomas Buckley* and *John B. Lawrence*, to secure $5000, with interest, which remained unpaid till after *Ellison's* death, and until a short time previous to filing the bill: 4. That the appellant had never offered to execute a deed, pursuant to the articles, nor required a deed of *Ellison*, though he was, from the time of executing the articles to the 1*st* day of *June*, thereafter, when the conveyances were, by the articles, to have been executed, perfectly capable of transacting business.

To this answer, the appellant filed a general replication, and testimony was taken, in the cause, to the above points stated in the answer.

The inadequacy of price insisted on by the answer was established; to what degree the Judges who passed upon the evidence differed, as will be seen by their opinions. The mortgage upon the *Newburgh* lots was also proved to have existed, as insisted by the answer. Proof was likewise taken as to the mental capacity of *Ellison* to make the bargain in question, the respondents insisting that he was disqualified by habits of intoxication, and the appellant denying this. The evidence upon the point was contradictory. For this I also refer to the opinions delivered, as well as for

the proof in relation to *Ellison's* capacity to have fulfilled the articles. The testimony in the cause was very voluminous, occupying, in the abstract printed for the use of the Court, more than 100 pages. I forbear stating it, because all that may be material to the questions raised by the counsel or determined by the Court, will be found in the opinions of the Chancellor and Judges.

*August 7th*, 1822, the Court of Chancery declared, that from the great inadequacy in value of the *Newburgh lots*, compared with the two farms in *Montgomery* and *Walkill*; also from the habits of intoxication in which *Ellison* had indulged in the last years of his life, and the mental debility produced thereby; also from the want of readiness and ability in the complainant, to convey a good and unincumbered title, at the time fixed for the performance of the contract, or at any time after, during the life of *Ellison*; the articles ought not, in equity and good conscience, to be decreed to be carried into effect; and dismissed the bill, with costs.

The late Chancellor *Kent* assigned the reasons for this decree, as in 6 *John. Ch. Rep.* 223 to 235, *S. C.*

*J. Duer*, for the appellant, submitted the following points:

<span style="margin">Points of fact raised by counsel for appellant.</span>

1. That there was, in fact, no material inadequacy of consideration.

2. That it was a speculation on the part of *Ellison*, and any trifling inadequacy of value that may appear, arises from subsequent circumstances.

3. That, in addition to the evidence afforded by the manner in which the bargain was negotiated, the direct testimony in the cause, as to *Ellison's* competency, is conclusive in favor of the appellant.

4. That the negotiation between the parties was honorably conducted, and the agreement just, fair and equal in all its parts.

After examining the case very fully, in relation to these questions of fact, an outline of which is given in the opinions of the Chief Justice and *Sudam*, Senator, he proceeded to the discussion of the following legal points:

1. That inadequacy of consideration is not, of itself, a sufficient ground to deny a specific performance.

2. That occasional intoxication is no ground of defence in any case, or under any circumstances.

3. The existence of a mortgage upon property agreed to be sold, or conveyed, is no reason for refusing a decree of specific performance ; and the appellant was not otherwise in fault.

4. That the appellant is without remedy at law.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

Points of law
raised by same
counsel.

He said, there are two classes of cases, in which a Court of Chancery will enforce the specific performance of a contract : 1. Where the party seeking the performance has lost his remedy at law by accident, or not by his own culpable neglect or omission. In such case a specific execution of the contract ought not to be refused, except upon such grounds as would justify the Court in setting it aside. 2. Inadequacy of price, unless so gross as to be, in itself, evidence of fraud, or unless accompanied by circumstances of fraud or misrepresentation in the party seeking performance, or surprise, ignorance, mistake, delusion, or incapacity of mind on the other side, is no ground for refusing a specific performance.

At law, where a party would recover damages, he must shew a literal compliance with a condition precedent ; but, as an omission of this does not affect the equity of the claim, Chancery will yet relieve. *Davis* v. *Hone*, (2 *Sch. & Lef.* 347) lays down the general doctrine on the subject; and partially illustrates it. Ld. *Redesdale* says, " a Court of Equity frequently decrees specific performance, where the action at law has been lost by the default of the very party seeking the performance, if it be, notwithstanding, conscientious that the agreement should be performed ; as in cases where the terms of the agreement have not been strictly performed on the part of the person seeking specific performance ; and, to sustain an action at law, performance must be averred according to the very terms of the contract. Nothing but specific execution of the contract, so far as it can be executed, will do justice in such a case." His lordship refers to a loss

ALBANY,
April, 1824.

Seymour
v.
Delancy.

of the remedy by neglect. The interposition of the Court may be still more imperiously called for, where it is gone by the sickness, absence or death of the party. In case of his death, the obligation descends upon the heir. (*Holtham* v. *Ryland, Nels. Rep.* 205.)

There is a well grounded distinction between cases where the party is wholly without remedy at law, and where, though he has a remedy there, it may be inadequate. In the latter case, if a specific performance be denied, yet, by recurring to his action, he may obtain damages ; but in the former, the reasons for denying a specific performance should be stronger ; for if a remedy is denied in that shape, he must go wholly unredressed. The Chancellor omits to notice this distinction. He takes it for granted that our remedy at law still exists in full force, and speaks of *leaving the appellant to seek his compensation in damages there*. " If (says he) the party be sent to law to submit his case to a jury, relief can be afforded in damages, with a moderation agreeable to equity and good conscience." Thus he, in terms, denies what we think cannot be questioned, that the effect of his decree was to deprive us of all remedy whatever ; because it is not pretended that the articles were so far literally complied with as to save our legal remedy. Ld. *Hardwicke* says, in *Attorney General* v. *Day*, (1 *Ves. Sen.* 222,) " the general rule certainly is, that this, (carrying a contract into execution) is discretionary in the Court, but will not hold in the present ; for that is generally in cases where there may be an election of two remedies, by coming here for a specific performance, or by action at law ; whereas here there can be no remedy at law." He does indeed say, that on a strong objection, the Court may refuse a decree even in that case ; but this is not at all inconsistent with what he had before said ; or with what we contend for. On a *strong* objection, a contract would not only be denied the aid of Equity, but would be set aside, even after it was executed. If we are entitled to the benefit of his doctrine, in its full and unqualified extent ; if it be true that where the remedy at law is gone, not by neglect, but by accident, as in this case, the reasons for refusing to decree must be of a very strong and

ALBANY,
April, 1824.

Seymour
v.
Delancy.

imperative character, and, at least, as strong as will warrant the setting aside a contract, the present cause is disposed of. The only ground upon which the Chancellor proceeds is inadequacy ; and nothing is clearer than that this is no cause for setting a contract aside, unless it be so gross as to warrant the inference of fraud. This the Chancellor admits was not the case. Here was no refusal of performance at the day. The non-performance arose from the sickness of *Ellison*, who, if he had recovered, would doubtles have accepted the conveyance. Under such circumstances, we were not bound to put ourselves in a capacity to tender the deed. (*The counsel contended, from the evidence, that the Chancellor was mistaken in supposing Ellison capable of business on the 1st June*, 1820.)

But suppose we are mistaken in this view of the subject ; at any rate, the Chancellor had a discretion to grant or refuse the performance ; and we proceed to inquire into the manner in which this has been and should be exercised. The Chancellor says, " it is not a case requiring the aid of the Court *ex debito justitiæ*." If not, then we are subjected to the mere arbitrary discretion, the caprice and humour of the Judge. We had supposed the remedy for a specific performance was to be viewed in a very favorable light ; and to be upheld if possible. It is a remedy alone adequate to the injury received, and good faith mainly depends upon its enforcement. There is an obvious distinction between the case of real and personal property. For the latter, a satisfaction in money may generally be obtained. But purchases of real estate are, many times, the most important transactions of a man's life. They are generally made with a view to settle himself or family. There are a thousand circumstances which a jury cannot reach ; and when the contract is violated, we claim the same right to a specific performance as to damages from a jury. The Chancellor may deny a specific performance, but he cannot do so unless according to established rules. In *Hall* v. *Warren*, (9 *Ves.* 608) the Master of the Rolls says, " It is as much of course, in this Court, to decree a specific performance, as it is to give damages at law." And in *Halsey* v. *Grant*, (13 *Ves.* 76) Ld.

*Erskine* said, " This jurisdiction had its origin upon the foundation of a legal right, the law giving the title ; but a Court of law, from the modes in which justice is there administered, not being capable of giving a complete remedy and all the relief to which the party was entitled." How is this reconcileable with the language of Ld. *Eldon*, as quoted by the Chancellor from *Mortlock* v. *Buller*, (10 *Ves.* 292 ;) and *Willan* v. *Willan*, (16 *id.* 83 ?) There is, in truth, no difficulty or inconsistency in these cases, when understood. No doubt, specific performance may be refused, and the party put to his remedy at law ; but there are also cases governed by fixed rules. The discretion to be exercised is not arbitrary. It was said in *White* v. *Damon*, (7 *Ves.* 30, 35) " that giving specific performance is matter of discretion ; but that is not an arbitrary capricious discretion. It must be regulated upon grounds that will make it judicial."

Why is it that specific performance is ever denied? We answer, because there are circumstances which should influence a jury in their estimate of the damages. Unless this is so, the reason fails, and the party has a perfect legal right to a performance. He should not gain an advantage by the choice of his forum ; and the only inquiry should be, are there circumstances upon which the case should go to a jury ?

To mere inadequacy of price, unless so gross as to be evidence of fraud, or attended with actual fraud, surprise, ignorance, mistake, delusion, or imbecility of mind, *caveat emptor* applies, both in Courts of law and Equity. If the party agree to take real property at a given day, and is not ready to receive it, the vendor may set it up at auction the very next day, and, in an action, recover the difference between the prices of the two sales ; or he may enforce the contract, specifically, in Chancery. But what does the doctrine amount to, that mere inadequacy shall be a defence ? Do gentlemen mean to say, there must be an exact equality ; and abolish, at one blow, the entire equity jurisdiction upon this head ? If not, what is to be the degree of inequality ? Shall it be $\frac{1}{4}$, $\frac{1}{5}$, or $\frac{1}{10}$ ? This, it is said, must be referred to

the doctrine of discretion. We ask, is not such a system dangerous, as being arbitrary, and dependent on rules, of which the party is unapprized, till the moment they are promulgated ? A doctrine which converts the bench of a Judge into the throne of a tyrant ? It is perfectly easy to see whether a contract is such as should be performed. To deny this, is to say we have no moral sense. There is, then, no uncertainty in the rule for which we contend ; nor does it place the matter beyond the exercise of a legal and sound discretion, such as may be reduced to practice. There is, on the other hand, an uncertainty in the value of land, and other articles of sale. This must be so, from the nature of things. It is a subject on which witnesses may differ, and always do. If this be the case in *England*, where the value of real property is very nearly fixed, how much more so in this country, where it depends on speculation and contingency.

We also admit that Equity is not bound to decree performance, where the bargain is hard and unconscionable ; but this does not follow from the price being inadequate. All the cases which went on this ground, (perhaps with a single exception) beside mere inadequacy, involved moral considerations. The *Marquis of Normanby* v. *Lord Beckley*, (*cited in 5 Vin.* 539) as stated by the Chancellor, is, that the contract must be *reasonable and fair in every particular*. This is not a reported case. It is taken from the statement of counsel, unaccompanied with the facts upon which it proceeded. The Chancellor says, it was sanctioned in *Young* v. *Clerk*, (*Prec. in Ch.* 538) but, in truth, that was a case of actual fraud. Lord *Macclesfield* says, it was " a shameful contract," which marks his sense of the moral turpitude of the transaction. The case in *5th Viner*, 549, *pl.* 12, (*Squire* v. *Baker*) does not tell us what constitutes an unreasonable contract. It purports to have come from Lord *Harcourt*, though it was not found among his manuscripts, but among those of his secretary. (2 *Ves.* 159, 627.) Cases coming from this source have been frequently treated as wanting all authority. This will be seen in *Creuze* v. *Hunter*, (2 *Ves.* 159) *Connolly* v. *Parsons*, (3 *id.* 627) and *Mortlock* v. *Bul-*

*ler*, (10. *id.* 306, *Sol. Gen. arguendo.*) *Savage* v. *Taylor*, (*Cas. Temp. Talb.* 234) is next relied on by the Chancellor; but, according to his own statement, fraud was the ground there expressly taken. The articles were unfairly obtained. I do not find, in that case, the words quoted by the Chancellor, *that it would not alter the case, even if possession had been given under the articles*, which may be owing to a difference in the editions which we have examined.

The Chancellor next relies upon *Thompson* v. *Harcourt*, (*2 Br. Parl. Cas.* 415) and he says, the bill was dismissed, and the decree affirmed in parliament, on the ground of inequality. Now, strange as it may seem, the bill was in that case sustained, and a specifick performance decreed, as appears by the case itself, both in the *old ed. of Br. P. C.* 2 *vol. p.* 415, and in 1 *id. Tomlins'* ed. 193. In that case the parties agreed, on the day of performance, to a postponement; and an act of parliament passed, declaring the contract void, unless the vendor had the whole stock, which he contracted to sell, at the day. The amount sold was £1000, for the consideration of £9200. Two objections were taken. 1. Great inadequacy of price. 2. Want of the whole amount at the day, the vendor having on hand only £290 at that time. For the residue he relied on his being the owner of certain stock, as trustee, to make up the amount; but this was held not to be within the statute. Yet the Court decreed a specific execution as to the £290, thus overruling the objection of inadequacy, and leaving the case, so far from being against us, a decisive one in our favour.

*Barnardiston* v. *Lingwood*, (2 *Atk.* 133) was a bill, not to execute but set aside a contract, upon the familiar principle, that it had been obtained from a necessitous remainderman. In *Buxton* v. *Lister*, (3 *Atk.* 385) the remarks of Ld. *Hardwicke*, as quoted by the Chancellor, will be seen, on an examination of the whole case, to apply solely to contracts concerning personal property. He uses the general words relied on by the Chancellor, as to certainty, fairness and justness, but they have no relation whatever to inadequacy of consideration, as will be seen by adverting to the questions raised in that cause. Yet he gives them the same

force, and quotes them nearly in the same language, as did the counsel in *Mortlock* v. *Buller*, (10 *Ves.* 301-2.) Nor did the question arise in *Joynes* v. *Statham*, (3 *Atk.* 388.) *The City of London* v. *Nash*, (1 *Ves. Sen.* 12 ; 3 *Atk.* 512, S. C.) was a case of peculiar hardship. The defendant agreed to rebuild houses, under what is called a building lease ; but, instead of doing this literally, he made extensive and valuable repairs. The effect of the bill would have compelled him to pull down the repaired houses ; which, the Lord Chancellor said, might be equal in value to new ones ; and, if not, adequate damages might be given at law. This view of the case shews that it had nothing to do with inadequacy of consideration. In *Underwood* v. *Hitch-cox*, (1 *Ves. Sen.* 279) I admit that Ld. *Hardwicke* lays stress upon inadequacy of consideration ; but that was by no means the sole ground. The defendant articled with his uncle, for the purchase of a copy-hold in fee ; and the plaintiff soon after agreed with the defendant to purchase of him. The uncle surrendered to the nephew and his wife, and to the heirs of their bodies, remainder to the nephew in fee ; but, notwithstanding the formal title, as derived from the surrender, the plaintiff insisted that the defendant should execute, the uncle being, in fact, a mere trustee for the nephew. Unless the surrender was first set aside, the defendant could not make a good title. The material inquiry was as to the legality of the surrender, therefore, which, as contended, was fraudulent. Ld. *Hardwicke* said, the uncle intended it as a bounty to the family of the nephew ; and, therefore, he would not set it aside, in favour of a purchaser who should take it away from the family. I agree that he does afterwards advert to inadequacy, as a distinct ground, and I am willing the case should be considered an authority against us ; but it is the only one. *Faine* v. *Brown*, (cited in *Ramsden* v. *Hylton*) is also relied upon, and stated at large by the Chancellor ; but this is not a reported decision. It was merely cited by counsel, in the course of the argument, and was not recognized as an authority, nor even mentioned by Ld. *Hardwicke*, in the course of the argument, or exam-

ination of the principal case.  No inadequacy is mentioned, as the ground of decision ; and, for aught that appears, a full price was given.  Would the Court have refused a decree, on the naked ground of inconvenience, which is the only one stated in the case ?  It is not a good authority.

*Day* v. *Newman*, (2 *Cox*, 77) is, perhaps, the most formidable case with which we have to contend.  This was cited by counsel, in *Mortlock* v. *Buller*, (10 *Ves.* 292, 300.)  The Chancellor says of it, that it " came before Ld. *Alvanley*, in 1788, and there was an agreement, in writing, for the purchase of an estate of £20,000, which was proved not to be worth above £10,000. There was no circumstance of *fraud* or surprize in the case, and he thought the inadequacy of price, alone, was sufficient, not to induce him to decree a specific performance."  I admit, the Master of the Rolls does appear to have rested his decree on the inadequacy ; but, on referring to the case, the Court will perceive, that if there was not fraud, the vendor's conduct had been such as to deprive him of all countenance.  The sale was to a young man, the son, for £20,000, of an estate, which had before been offered to the father for £9000.  The young man was at the vendor's house and inveighled into the purchase.  Though these circumstances were not mentioned by the Master of the Rolls, they must have influenced his opinion.  He says, " If I had any doubt about the inadequacy of the price, I would put it in some mode of inquiry ; but, as the case stands, the value is £9000. And then the question is, whether a young man shall, in this Court, be holden to a bargain like this."  Why mention the vendee's youth, if he intended to rely solely on inadequacy ? Clearly, because he had been misled by his inexperience. Again, he had such strong suspicion of fraud, that on the question coming up as to costs, he proposed to the plaintiff that he should give up his contract, and his bill should be dismissed without, and the defendant's with costs."  Why should he doubt about the costs, if the conduct of the party had been fair ?  The quotation of this case by counsel, in *Mortlock* v. *Buller*, (10 *Ves.* 292) shews the danger of trusting to their statement alone.  As cited by them, it went on the

ALBANY,
April, 1824.

Seymour
v.
Delancy.

mere ground of inadequacy. This remark will enable us to judge of the weight due to *Tilly* v. *Peers*, (10 *Ves.* 301) which is the next case relied upon by the Chancellor, from the mere statement of Sir *Samuel Romilly*, counsel in the cause. *Eyre*, Ch. Baron, is there stated to have relied solely on the hardness of the bargain. What degree of inadequacy constituted the hardness of the bargain does not appear. It might have been so great as, *per se*, to have evinced fraud. But this case rests on the mere authority of Sir *Samuel Romilly*, who afterwards, in *Western* v. *Russell*, (3 *Ves. & Beames*, 187, 190) took directly the opposite ground, declaring, in terms, that "mere inadequacy of price, if it had been proved, is no ground for refusing a specific performance. It was much pressed, certainly, in *Mortlock* v. *Buller*, but the argument received no countenance from the *Ld. Chancellor*."

Of *White* v. *Damon*, (7 *Ves.* 30) Chancellor *Kent* declares, " Ld. *Eldon* was inclined to say, that the sale by auction could not be set aside for mere inadequacy of price. This was an auction case, which undoubtedly rests on peculiar grounds, and the Chancellor spoke of *setting aside* the sale. So far the case has no application." The inference, from this statement of the case, is, that the bill was filed to set aside the sale. It was, in fact, to compel a specific performance ; and it was held that inadequacy was no ground for refusing. Ld. *Eldon* says, "I am inclined to say, that a sale by auction, no fraud, surprize, &c. cannot be set aside for mere inadequacy of price. It will be very difficult to sustain sales by auction, if this Court shall not sustain the agreement." This is a very material addition. Chancellor *Kent* admits, that the execution of the contract was rightly denied on other grounds, but relies upon Ld. *Roslyn's* doctrine, as evidence of the general rule, that the execution of a sale will be denied merely for inadequacy. I read from his opinion, to shew that this is not so. Ld. *Rosslyn* says, " This bill is filed for a specific performance of an agreement for the sale of a freehold estate, &c. The facts

are very short.   This lot was put up, together with other lots, part of the same estate, at *Gosport*.   There was no bidding for that lot.   There were bidders for all the other lots.   After the sale, · *Smith*, the auctioneer, advanced £1000 to the vendor with great security, for he had all the deposits, and the money was to be paid into his hands for all the other lots ; so that, except the temporary accommodation, the vendor, whom *Smith* knew to be a distressed man, forced to sell, had no other benefit of that advance.   The auctioneer, however, chose to take a better security than he would have had as auctioneer ;  and he chose to take, as an additional security, a conveyance of this lot, with a power to sell, and his receipt to be a discharge for the price.   The manner in which he proceeded was, after having received a considerable part of the money upon the other lots, in 1797, exactly a year, he puts up this wharf and premises, situated at *Gosport*, to sale at *Garroway's*, certainly not without the knowledge, but certainly without the consent of the owner.   The place of sale was not very proper, and the time was very rapid.   The premises were bought for £1120, and the bill is filed by the purchaser.   It appears in proof, and very distinctly, that the value of the premises is upwards of £2000 a year.   I have nothing to do with this case in a Court of Equity."   What, then, is that case ?   Is it not the misconduct of the auctioneer, in taking advantage of a distressed man, which is almost solely relied upon as the ground of the decree ?   Similar ground was taken by Lord *Eldon*, in *Mortlock* v. *Buller*, (10 *Ves.* 292.)

Such are the authorities on which the Chancellor has founded his opinion.  They amount to this, and no more, that Chancery is not bound to decree the performance of a hard and unconscionable bargain.   What weight there is in the conclusion which the Chancellor has drawn from them, I shall not, at present, stop to inquire farther ; but proceed to the cases upon which we rely, the greater part of which have also been passed upon by the Chancellor.  ·

In *Parker* v. *Palmer*, (1 *Ch. Cas.* 41) inadequacy was the sole defence ; but relief was denied.   I do not rely much

on this case. The report of it is obscure; nor does it appear whether the inadequacy existed at the sale, or arose afterwards. In *City of London* v. *Richmond* (2 *Vern.* 421, 423.) the bill was to enforce the specific performance of a contract to take a lease at a rent of £750; the real annual value being only £300. The Chancellor said, "as a beneficial bargain will be decreed in Equity, so if it happens to be a losing bargain, for the same reason it ought to be decreed." In the case (*cited in Mortimer* v. *Capper*, 1 *Br. Ch. Cas.* 158) by Ld. *Thurlow*, in giving his opinion, the defence was, that the contract was to enclose for £20; whereas it was worth £200. This was on a bill for specific performance. and the inadequacy was admitted; yet it was held no defence. In the argument of *Mortlock* v. *Buller*, (10 *Ves.* 298) it is true that Sir *Samuel Romilly*, and other counsel, denied the authority of this case; but the decision of that cause shews that the Court approved of it.

*Adams* v. *Weare*, (1 *Br. Ch. Cas.* 567) is not merely analagous, but exactly similar, in all its material circumstances, to the present case, except that it was vastly stronger in the extent of inadequacy, which was the sole defence. The Master of the Rolls decreed a performance, and the decree was affirmed by the Lord Chancellor, who says, (*p.* 568-9) "I am not very anxious to discuss the point, what bargains the Court will execute or not; but when the Court has laid it down as an article of the equity which men shall obtain here, and which they cannot obtain at law, that, instead of damages, they shall have a specific performance, and that every agreement must be performed, unless something, at the time of making the bargain, or something done since, is to amount to a waiver of it at the time of carrying it in to execution; if you do not confine yourself within that limit, there are no bounds whatsoever; for rules ought to be fixed, and it would be calamitous that the matter should rest upon such loose expressions as *hard and unconscionable;* which expressions, unless they are properly to be applied, mean nothing." Again: (*p.* 570,) "It does not appear to me what the value of the premises would be, if applied to the purpose of working the mill. What the advantage of it might be is not stated. Therefore, I think that without entering

into the particulars of the case, the Master of the Rolls has done right ; for no case can be cited, where parties have made a bargain with their eyes perfectly open, and no sur- prize whatever, as in this case, on which the Court has re- fused to decree a specific performance. Here is no mistake of the object, as in *Hick* v. *Philipps* ; and, as to the great- ness of the price, *Adams* had a right to ask a large sum, and the other had agreed to give it." How strikingly does this observation appeal to the common sense of every man. Has not any one a right, not merely legal and civil, but moral, to ask what he pleases ? and if another, with his eyes open, and on full deliberation, consents to give it, on what ground can a Court of Equity gainsay the deed, and deny performance ?

*Collier* v. *Brown*, (1 *Cox*, 428,) cited by the Chancellor, was the case of an agreement to sell at £275. But the sel- ler repented of his bargain, on an offer, a short time after, of £400. The parties bargained with their eyes open. It was contended, on a bill filed by the purchaser for a specific execution, that it was the constant course, in Courts of Equi- ty, to refuse their assistance in enforcing a contract, where the price was grossly below the real value ; but the Court said, " the parties bargained with their eyes open, and that no imposition or surprize was proved in the case ; that *Ma- ry Turner* was very well satisfied with her bargain, until she found she could get more for the premises ; that under these circumstances, mere inadequacy of price (where it cannot be used as evidence of fraud,) is not, of itself, sufficient to prevent the Court from administering its usual Equity." Here was a direct and solemn decision on the very point we are discussing. The Chancellor supposes that the case went upon its special circumstances. Does he mean to say, that in order to be relieved, one must express his dissatisfaction with the bargain immediately ? Is such a doctrine rational, or consistent with his own view of this case ? Will not the in- jury be the same, at whatever period the error or delusion is made known ? How is this case ? *Ellison* was satisfied to the time of his death ; and this controversy would, in all probability, never have arisen, had he not died.

Specific performance, on the ground of inadequacy, was resisted in *Emery* v. *Wase*, (8 *Ves.* 517) combined with the fact that the lands sold belonged to the defendant's wife ; but Ld. *Eldon* said, " I do not deny that mere difference in value, though considerable, is not of itself a sufficient ground for refusing a specific performance of a contract ;" thus laying down our position in terms ; and in *Coles* v. *Treeoth-ick* (9 *Ves.* 246) he says, " Inadequacy of price does not depend upon a person giving *pretium affectionis*, from any particular motive, beyond what any other man would give, the reasonable price. But further, unless the inadequacy of price is such as shocks the conscience, and amounts, of itself, to conclusive and decisive evidence of fraud in the transaction, it is not itself a sufficient ground for refusing a specific performance." The Chancellor thinks this declaration not entitled to much weight, because it was said of a sale at auction ; but the observation was general, and not intended to be confined to sales at auction. The Lord Chancellor speaks of such inadequacy as will shock the conscience ; but sales at auction, at whatever under value, cannot, with any propriety, be treated as having such an effect. This is plain from the manner in which the same Chancellor treated the same subject in the previous case of *White* v. *Damon*, (7 *Ves.* 30) where he considers auction sales as standing on peculiar grounds, not to be governed by inadequacy. The rule was also laid down by him, in *Coles v. Trecothick*, as one applicable to all cases.

In *Burrowes* v. *Lock*, (10 *Ves.* 470,) the defendant, by will, had a 9th share of the residue of a testator's estate in the hands of a trustee, worth £288 ; and, being indebted to the plaintiff, agreed to assign his interest at £132, being apprized, before the agreement, of the amount due to him. On a bill filed to enforce an assignment, this was resisted on the ground of inadequacy ; but the Master of the Rolls said, " I do not know, if fraud is out of the case, that I can set aside this cotranct, or refuse to act upon it, merely on the ground of inadequacy of price ;" and he overruled the objection, and decreed according to the prayer of the bill. It may be objected, that the Master of the Rolls speaks of

setting aside contracts ; but, from the nature of the controversy, this must have been a mere mistake of words. He could mean no other than denying a decree of performance. This is a very strong case. The plaintiff had obtained a contract for the assignment, from the *cestuy que trust*, and was under the necessity of going to a Court of Equity to enforce a specific performance ; but his remedy would have been nearly the same at law, so far as the amount of the recovery was concerned ; and he would have been left to law, had he not come plainly within the rules upon which Chancery decrees performance. The price was palpably inadequate ; yet he was compelled to perform. Nor let it be objected, that the subject was personal property. This is a still stronger feature in our favour; for specific performance is, in such a case, much less favoured than in cases of real property.

We also rely upon *Cadman* v. *Horner*, (18 *Ves.* 10.) This also involved the question of inadequacy. The value of the property agreed to be conveyed was £1200, and the price to be given £600. The Master of the Rolls would, however, evidently have decreed performance, notwithstanding the inadequacy, had it not been that the vendee had been guilty of misrepresentation.

The last case relied upon by the Chancellor, is *Western* v. *Russell*, (3 *Ves.* & *Beames' Rep.* 187) before Sir *Wm. Grant*, Master of the Rolls, who declares, that " it is unnecessary to determine, as a general question, whether inadequacy of price might, or might not be a ground for refusing performance ; the case before the Court being that of the proprietor of an estate not alleged to have been under any incapacity, or deficiency of judgment, or to have been led, by accident or design, into a misrepresentation of the value." The general question there, then, was not passed upon ; and to make it an authority for the decree, in this case, it must be taken for granted, that the question of inadequacy could never arise, without being blended with others.

Are this Court, then, prepared to say, with the Chancellor, there is a very great weight of authority against us ? Take a summary of the cases upon which he relies. *Young*

v. *Clerk* was a case of fraud ; *The City of London* v. *Nash,* does not present the question ; and in *Faine* v. *Brown* the question of inadequacy did not arise, for the price was not unequal ; *Day* v. *Newman,* contained other circumstances ; *Tilly* v. *Peers* rests upon the quotation of counsel ; and in *White* v. *Damon,* the ground was oppression and injustice : so that he is reduced to the single case of *Underwood* v. *Hitchcox,* (1 *Ves.* 279) which, alone, is a direct authority in support of his opinion.

On the other hand, we present to the Court, not author-ities extracted from the statements of counsel, or loose *dicta* of Judges, but 8 cases, in which the objection of inadequacy was distinctly taken, and overruled, viz. *Parker* v. *Palmer,* (1 *Ch. Cas.* 41) *City of London* v. *Richmond,* (2 *Vern.* 421, 3) the case cited in *Mortimer* v. *Capper,* (1 *Br. Ch. Cas.* 158) *Thompson* v. *Harcourt,* (2 *Br. P. C.* 415) *Collier* v. *Brown,* (1 *Cox,* 428) *Emery* v. *Wase,* (8 *Ves.* 517) *Coles* v. *Trecothick,* (9 *Ves.* 246) and *Burrowes* v. *Lock,* (10 *Ves.* 470.)

This is not all. Numerous other cases are not suscepti-ble of explanation, if the ideas of the Chancellor be cor-rect. He takes the naked position, that inadequacy, alone, is enough to stamp the case with the character of hardship, &c. Now, take the numerous class of cases which relate to sales at auction, and inadequacy arising from subsequent circumstances, with cases in which *pretium affectionis* is giv-en. All these are anomalous, if the Chancellor's reasoning be correct. He admits, however, that it does not apply to sales at auction ; but on what ground do Courts refuse to set these aside for inadequacy ? Not of public policy ; be-cause they may be set aside, if fraud intervene ; but because the sale, being open and public, and the parties having a full chance to inform themselves, fraud is not to be presumed from inadequacy, whatever it may be. The same reasons apply to every fair sale, where parties act understandingly. Again : where the property is deteriorated in value, from subsequent circumstances, as in *Pope* v. *Roots,* (7 *Br. P. C.* 118) *Mortimer* v. *Capper,* (1 *Br. Ch. Cas.* 156) and *Jack-son* v. *Lever,* (3 *Br. Ch. Cas.* 604) be the inadequacy

what it may, yet the contract will be enforced; and the rea-son is, because, from the nature of the transaction, every presumption of fraud is repelled.    So, where the property is purchased with the view to a speculation, as in *Adams* v. *Weare*, (1 *Br. Ch. Cas.* 569, *cited to this point,* 1 *Mad. Ch.* 324.)    Inadequacy can never be a mere abstract question, but must always depend upon the motives and circumstan-ces.    Whenever these are peculiar, they are placed on the ground of *pretium affectionis*, where inadequacy, to any de-gree, is no reason for denying performance.

In the civil law, as stated by the Chancellor, a contract for the sale of land was recinded by judicial authority, though made in good faith, if the price was below half the value. But it will be seen, by 1 *Evans' Poth.* 22, that, even by that law, *pretium affectionis* is excepted.    Why such an excep-tion, if the Chancellor be correct ?    If inadequacy is enough, there is no propriety in the exception.    Is it not obvious that the reason of the civil law and our own is the same, viz. the presumption of fraud, which may be repelled by shew-ing the motive, and, in our own law, any other circumstan-ces ?

(Here the counsel examined the facts relied upon to shew that the case was within two of the exceptions to the rule which makes even gross inadequacy evidence of fraud, viz. that the purchase was viewed by *Ellison* as a speculation, from the general belief, prevailing at the time of the bargain, that the *U. S. Navy Yard* would be established at *Newburgh ;* and also that it came within the exception of the *pretium affectionis, Ellison* having previously bought the other $\frac{2}{3}$ of the property, and having ample means for improving the whole, and rendering it valuable to him far beyond the price which he gave.    (*See the opinion of Sudam, Senator, post.*)

It is not competent for the respondents to insist on artifice or misrepresentation.    No such defence was set up by the answer ; nor is it there pretended that *Ellison* was incapable of contracting.    All the answer says is, that he was *occasion-ally* incapable of business ; but this was with a view to an-swer our excuse for not tendering the deed at the day.    The Chancellor is not correct in supposing this to have been set

ALBANY,
April, 1824.

Seymour
v.
Delancy.

up as matter of defence. Independently of the purpose for which it was introduced, what do the words import? Do they not imply that *Ellison* was, generally, capable of business? Suppose we should say that his honor the Chancellor was occasionally incorrect; that he occasionally quoted cases, omitting the material circumstances; that he occasionally did this without examining the original cases; but relied on the quotations of counsel; that he occasionally cited cases as being against, when they were for us; would this be to deny his general accuracy, or that he was usually laborious and successful?

Drunkenness can certainly constitute no defence, unless the party, on becoming sober, disavows the contract. This is not proved or pretended. So far from it, there is no doubt that *Ellison* displayed, throughout the business, more than ordinary prudence and capacity.

The Chancellor relies upon the mortgage as another circumstance in the defence, which ought to be taken into consideration. I do not know whether he means that this alone would form a bar; or that it is to be connected with inability and inadequacy; and that the whole, conjunctly, are to preclude the relief sought, or any two of them are to have this effect. But if neither, separately, would do this, how could their union do it? There may be circumstances connected with inadequacy which would require the Court to deny a specific execution; but they are all moral considerations. If inability to make a title at the day, alone, is relied on, I have only to express my astonishment; for there is no doctrine better settled than that this is no bar; and, in nine instances out of ten, the only inquiry is, whether a title can be made at the time of the decree. I admit that neglect without excuse, followed by great delay, may grow into a waiver. So *Ellison* might have rescinded the bargain, by dissent, if there had been a default in tendering the deed without a proper excuse. But so far from dissenting, he left us in quiet possession. In relation to this part of the case, the Chancellor says we should have tendered the deed; for *Ellison* was competent to do business; though he

had just declared that, for two years before his death, he was incompetent.    This was while incompetency was necessary for another head of the defence.    When our failure depends upon his competency, the fact is changed, and, by the magic power of the Chancellor, he is suddenly healed.    If competency was important at any point of the transaction, it was so at the period when the deed was to have been executed.

In *Langford* v. *Pitt*, (2 *P. Wms.* 631) the Master of the Rolls says, " It is sufficient if the party entering into the articles to sell has a good title at the time of the decree, the direction of the Court being, in all these cases, to enquire whether the seller *can*, not whether he *could* make a title at the time of executing the agreement."    He refers to the case of *Ld. Stourton* v. *Sir Thomas Meers*, in which the Ld. *Stourton*, at the time of the articles for a sale, or even when the decree was pronounced, could not make a title, the reversion in fee being in the crown ; and yet the Court indulged him with time more than once for the getting in this title from the crown, which could not be effected without an act of parliament to be obtained in the following sessions. However, it was at length procured, and Sir *Thomas Meers* decreed to be the purchaser.    The same point was resolved in *Wynn* v. *Morgan*, (7 *Ves.* 202.)

[*Sudam*, Senator.   His honor the Chancellor appears to admit this to be the practice, at the close of his opinion. He says he heard no evidence upon the title ; because it is the course of the Court to refer the inquiry on that head to a master.]

*Duer*.   True.   This is only another inconsistency.   Notwithstanding this admission of the Chancellor, I see the want of title is inserted among the printed points upon the other side.    No position is better settled than that a good title in the grantor at the time of the decree is sufficient.   No point of practice is more familiar.    In *Wynn* v. *Morgan*, (7 *Ves.* 203) it was said by the Master of the Rolls, that the defendant did not allege that the execution at the day was material to him,  or that he considered it so ; but merely that at the day a good title could not be made.    He would not

say that a plaintiff could come into Court with a title at any distance of time, though he had none when the contract was made, or should have been executed ; but he said he was called on to say, that if he could not make a title at the time fixed on, he never could come for an execution.   That, he said, would contradict the whole current of authorities, and would oppose the uniform practice ; there was not a single instance of the objection having prevailed, when so nakedly stated.   (*The Marquis of Hertford* v. *Boore*, 5 *Ves.* 720, *S. P.*)   And in *Mortlock* v. *Buller*, (10 *Ves.* 292) one of the cases cited by the Chancellor, Ld. *Eldon*, at *p.* 315, lays down the same doctrine as perfectly unquestionable.

*J. V. Henry*, (same side) said he would apprize the counsel for the respondents that he should, in his reply, rely upon the following authorities in addition to those cited by his associate counsel :

To show that the mortgage was no impediment to a specific execution, (*Jenkins* v. *Hiles*, 6 *Ves.* 646.   *Clute* v. *Robison*, 2 *John. Rep.* 595, 614.   *Hepburn* v. *Auld*, 5 *Cranch*, 262.)

That the want of a remedy at law is a reason for granting relief in Equity, (*Newl. on Cont.* 89.   *Flint* v. *Brandon*, 8 *Ves.* 163, *per Master of the Rolls.*)

As to the objection on the ground of incapacity by reason of intoxication, (1 *Pow. on Con.* 29, 30, *and* 1 *Mad. Ch.* 239, *Am. ed.* 1817.   *Cook* v. *Clayworth*, 18 *Ves.* 12.)

That incapacity is not in issue, (*James* v. *M'Kernon*, 6 *John. Rep.* 543.)

*Talcott*, (Attorney General) for the respondents.   (*S. Jones*, same side.)   It will be important to remember, that the bill was filed in the Court below, not to set aside, but enforce the specific execution of the contract.   In this character, it invoked the extraordinary powers of the Court, and conferred the right and duty of taking into consideration every circumstance, which might render the interposition of the Court unconscientious or inequitable.   Though, perhaps, not intoxicated at the time, *Ellison* had, for several years, been in habits of intoxication ; the price was grossly inad-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

equate, and the Chancellor was of opinion that it was not right, upon the facts, to decree a specific execution against these infant heirs. Does this refusal deserve the epithets bestowed upon it ? Does it deserve to be called the exercise of a power dangerous, and tremendous in its consequences, as referring every thing to discretion ; and erecting the seat of a Judge into the throne of a tyrant ? What does the language of the Chancellor amount to ? Merely that one going into his Court has not a right *ex debito justitiæ* to demand the execution of a contract ; because, according to the doctrines of a Court of law, it might be made the subject of an action ; but that he has a right to examine the circumstances under which it was made ; and be guided by these. This is by no means a novel doctrine, nor is it without the most direct and ample authority in its support. In *Howorth* v. *Deem*, (1 *Eden's Rep.* 355) the enforcing specific execution is treated as mere matter of discretion. So in *Attorney General* v. *Day*, (1 *Ves. Sen.* 221, 222,) even where there is no remedy at law ; and *Underwood* v. *Hitchcox*, (1 *Ves.* 279, S. P.) So in *Bromley* v. *Jeffereys*, (*Prec. in Ch.* 138 ;) and *Carberry et ux.* v. *Tannehill*, (1 *Harris & Johnson's Rep.* 224.)

In *Perkins* v. *Wright*, (3 *Harris & M'Henry*, 326) it is recited in the decree as an established principle in Chancery, that a decree for a specific performance of any contract whatever is not a matter of course, but rests entirely in the discretion of the Court, upon a consideration of all the circumstances ; that the Chancellor was acquainted with no precedent of a decree for such a performance, where either the contract appeared hard or unreasonable in itself, or where, from a material change of circumstances since the contract, the performance would be attended with peculiar hardship to the defendant, it being the invariable practice of the Court, in such case, to refer the complainant to his remedy at law." *Simmons* v. *Hill*, (4 *Harris & M'Henry*, 258) contains this remark : " How often is it necessary to repeat, that when a contract is established, even by admission, it is still a matter of sound discretion, whether or not, under all circumstances, a performance shall be decreed." The doc-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

trine represented as being fraught with such direful conse-
quences, thus comes, on examination, to be a rule so well es-
tablished, and so equitable, that no one can mistake it ; and
none can deny its excellence.

It is said, the Chancellor has inverted cases ; that pecul-
iar circumstances, essential to their decision, are not men-
tioned by him.   On examination, it will be found, he can be
defended from these imputations.   But, before I proceed to
examine the cases cited by him, I call upon the Court to
view some of the leading features of the transaction it be-
comes necessary to investigate.   [The counsel here con-
sidered the evidence, as to the circumstances from which the
contract arose, the inadequacy of value, and the incum-
brance upon the *Newburgh* lots, and asked,] Ought such a
contract to be carried into execution, unless some imperi-
ous rule of the Court demands it ?

It becomes necessary to examine the principles upon
which Courts of Equity proceed, in decreeing a specific per-
formance.   They operate in a two-fold way, according to
the justice and equity of the case.   They either rescind the
contract, and deprive the party of all remedy, or simply de-
ny all interference.   Circumstances which authorize the lat-
ter course need not be so strong as those which warrant the
former.   In the former cases, Courts both of law and Equity
have concurrent jurisdiction, as in case of fraud, against
which either may relieve ; and the only difference is in the
remedy—a Court of Equity cancelling the instrument, and
destroying all remedy, and a Court of law merely refusing
to enforce it.   A Court of Equity sets aside and annuls the
instrument ; therefore, and, upon slighter circumstances of
impeachment, it may merely refuse to carry it into execu-
tion ; or, as is often done, modify the relief sought.   In the
latter case, it merely refuses the cumulative relief of
a Court of Equity, but leaves the party to his remedy
at law, if he has any.   It follows, from the nature of the
subject, that the grounds of relief are different in the two
given cases, of enforcing or setting aside.   It is absurd to
say, that a Court of Equity will require the same evidence,
to turn a party round to his legal remedy, on the one hand,

or cancel all remedy on the other, by going a step farther, rescinding the instrument, and declaring that it ought not to be enforced any where. This distinction has always been recognized, from the origin of Chancery jurisdiction over contracts. (*Savage* v. *Taylor, Cas. Temp. Talb.* 234. *Day* v. *Newman*, 2 *Cox*, 77. *Mortlock* v. *Buller*, 10 *Ves.* 292. *Davis* v. *Symonds*, 2 *Cox*, 406.) So of all the cases, wherever the question has arisen. The different degrees of evidence are regulated by the different effect and operation of the decree in the two given cases. A decree to set aside a contract may be bottomed on fraud, proved in a variety of ways. One is inadequacy, so gross as to warrant the inference of fraud, according to the cases cited on the other side. It must, then, be such as to shock the judgment of rational men. Where the object is not to annul the contract, but induce the Court to say it shall not be specifically performed, the inadequacy need not be so striking; and when the Court require the same evidence in both cases, they confound and destroy a well settled and ancient distinction. Why should that strong proof be required, to secure the neutrality of the Court, which is necessary to set aside the contract? The very reason why Chancery sends the party back to a Court of law, pre-supposes that the contract is valid, and not to be set aside; and to call for the proof of fraud, in such a case, is absurd. It is calling for what destroys the instrument, in order to warrant the sending it to another forum, with a view that it may be enforced, though to a less rigorous extent. It may be difficult to lay down any general rule, by which this class of cases are to be governed; but thus much may be said, that before the Court of Chancery will lend its gratuitous aid, to compel the execution of a contract, it will be satisfied that the contract is, beyond all doubt, just and fair. The matter must, then, as the Chancellor says, rest in sound judicial discretion. That such is the rule, is established by a multitude of adjudged cases, some of which have been cited by the Chancellor, and some of which he did not think it important to cite. In *Johnson* v. *Nott*, (1 *Vern.* 271) decided in 1684, *Hill* purchased of *Nott* a reversion, at an under value. At first the contract was set aside, but the Lord

Keeper reversed that decree. Then a bill was filed to enforce it; but this was denied by the Lord Keeper, who said, " Upon the first hearing, on *Nott's* bill, he thought it a hard case, though he did not see sufficient reason to set aside the contract;" but, as to the plaintiff's bill, he said, "a contract which carries an equity, to have it decreed in specie, ought to be above all objection." As to purchases made of heirs, the subject in relation to which he speaks, I admit the Courts are more strict than where the party is in an independent situation; but the case shews, that there may exist such inadequacy as, though not evidence of fraud, and calling upon the Court to set aside the contract, yet they will be sufficient to warrant them in refusing to give it effect.

It is said, that the expressions *hard* and *unreasonable* could not be applied to simple inadequacy; but the import is perfectly applicable, not only in common sense, but upon authority. What do Courts, and every body else understand, when it is said that a neighbour has made a hard bargain? Is it not, simply, "that he has given too much for the whistle?" *Johnson* v. *Nott*, (1 *Vern.* 271) is an authority to shew its legal meaning. In the *Marquis of Normanby* v. *Beckley*, (5 *Vin.* 539) Lord *Somers*, C. had said, long before, that "the Court would not carry agreements into execution, unless the contract was *reasonable* and *fair*, in every particular." Nor is this case answered, by saying it was a quotation of counsel, or questioning the manner in which it found its way before the public. The same distinction was sanctioned by *Green* v. *Green*, (5 *Vin.* 538) in the House of Lords, A. D. 1710 ; and the same point is advanced in the *Grounds and Rudiments of Law and Equity*, 76. Whether *Young* v. *Clerk*, (*Prec. in Ch.* 538) involved actual fraud and corruption, or not, these were not at all relied upon in the decision. Ld. *Macclesfield* said, he was "clear of opinion, that this Court was not bound to decree a specific execution of articles, where they appeared to be unreasonable, or founded on fraud, or where it would be unjust or unconscionable to assist them ; that, from the circumstances of this case, these articles were plainly of that sort ; that though there was no direct fraud proved, yet, from the *great under-value* of the

land, and that, too, without any expense whatsoever on the plaintiff's part, it appeared to him to be an unreasonable and shameful contract;" thus putting it distinctly on the value of the land. Are the counsel correct, in saying the inadequacy was so gross as to evince fraud? The Court said not—that there was no actual fraud—and is it fair, in determining the weight of a case, to imagine circumstances which might have been, but were not taken into consideration? The Chancellor is not alone in this exposition of *Young* v. *Clerk*. The same case is cited in *Hick* v. *Phillips*, (*Prec. in Ch.* 575) and the reason of it given. The defendant, in that case, articled to purchase of the plaintiff an estate, at 35 years, paying £50, the whole estate being represented to be freehold; whereas a part was copy-hold. The plaintiff covenanted to convey, on payment of the purchase money; but, because a part was copy-hold, the defendant refused to go on, and the Ld. Chancellor refused to decree an execution. He said, " Courts of Equity were not bound to assist contracts which were harsh and unequitable, or were attended with such circumstances as would be a hardship on the defendant; that the case was proper for a jury at law, who could mitigate the damages, according to the circumstances, which a Court of Equity could not; and he left the plaintiff to make the most of it at law. It is added, that the plaintiff, in strictness, could not perform. This, by the by, also shows, that the rule of sending or leaving a party to his chance at law, does not depend upon the question, whether, from what appears, he has a remedy there, or not. The case goes on, and the case of *Young* v. *Clerk* was cited, wherein the over-value of the land was the reason the Court would not decree an execution of the leases; and, for the same reason, ought not, for the over-value of the money in this case; and, therefore, dismissed the bill." This was within two years after the decision in *Young* v. *Clerk*. The Court not only declare that case to have gone on the value of the land, but they take the same ground themselves.

We are told that the Chancellor has exactly inverted the case of *Thompson* v. *Harcourt*; that a specific execution was decreed *pro tanto*; but it is the counsel who are mista-

ken. There were two agreements for the transfer of the stock. The last, which was made *October 5th*, 1720, provided that the appellant should, at the next opening the books after *Christmas*, 1720, upon payment of £9200, transfer to the respondent £1000 South Sea stock; and the respondent covenanted to pay the £9200, on that day; and bound himself to this in a penalty of £6000. This was the contract in question. The appellant not having the stock on hand at the time of the contract, except £290, afterwards procured and tendered it at the opening of the books. Being refused, he sued the respondent at law in the Exchequer; and the respondent filed his bill in the same Court for relief against the contract and the penalty. It went through several stages; and, in the mean time, the act of parliament passed, as mentioned on the other side. In *Mich.* term, 1721, the vendor filed a cross bill to compel the specific execution; and the case then stood thus : The vendee's bill was to have the agreement cancelled in consequence of the bursting of the bubble, while the vendor's bill was to have a specific performance; but the decree was in favour of the vendee, who sought the recission of the contract, on the ground that it was void, except as to the £290. The Court did not set aside the contract, but merely relieved against the penalty, and ordered it to be delivered up; dismissing the bill for a specific execution, and granting a perpetual injunction against proceedings at law. The result, then, was that the vendee was relieved against the penalty on the usual grounds; and the vendor denied the specific performance which he sought. The Court did not find sufficient inadequacy to set aside the contract; but they did find it enough to warrant them in a refusal to decree its specific execution, within the distinction for which we have contended. Another ground was, that the fall in the value of the property, subsequent to the contract, was not a foundation for setting it aside. On appeal, it was argued, that a specific execution should be denied; 1st, upon the statute which had passed; and 2dly, upon the extreme hardship of the case. The decree being no more than a simple affirmance, we cannot see the grounds taken

by the Court, except as we guess from the arguments of the counsel. It is cited in 5 *Vin.* 548, as having gone on the grounds supposed by the Chancellor. *The grounds and rudiments of Law and Equity,* (*p.* 76) supposes it to have gone on that ground. That it did go on this ground is fairly to be supposed from the repeated declarations of those who lived near the time when the decision took place. The case is stated in *Viner,* as coming from the MS. of Ld. *Harcourt.* If we are incorrect in our ground, at any rate, it decides either that when one goes to be relieved against a penalty, he shall first be required to pay what is really due, or that there was not hardship enough to annul the agreement, entirely, on the ground that the stock had subsequently fallen. One of these consequences must follow, from the vendee being held to pay what was secured ; and the case cannot possibly be used as an authority against us.

To the case of *Squire* v. *Baker,* (5 *Vin.* 549, *pl.* 12, *A. D.* 1726) cited by the Chancellor, may be added several cases, to the same point, also cited in the same volume of *Viner,* 533. These cases, it is true, in common with *Squire* v. *Baker,* are collected from Ld. *Harcourt's* manuscript tables. To diminish their authority, they are called by counsel, the the tables of his secretary. Whether so or not, they must have been made under his direction, and for his use. Would he employ a man for this purpose, so inaccurate that his labours could not be relied upon ? If so, would he not have corrected them. But, it is most surprizing, that he should have fallen into the same inaccuracy, in 5 or 6 cases given to us from the same source. *Rudiments of Law and Equity, p.* 76, supports the same doctrine. So does *Barnardiston* v. *Lingwood,* (2 *Atk.* 133.) It is there said, " In the case of a hard bargain, where it is not absolutely executed, but executory only, the constant rule of the Court is, not to carry it into execution." Whether this case related to the question of inadequacy or not, here is an important dictum in favour of the ground taken by the Chancellor. It was insinuated, that he must have taken his view of *Buxton* v. *Lister,* (3 *Atk.* 385) from the quotation of counsel in *Mortlock* v. *Buller,* (10 *Ves.* 301-2.) He says, Lord *Hardwicke* remarked, in

ALBANY,
April, 1824.

Seymour
v.
Delancy.

that case, " that nothing was better established in Chancery, than that every agreement or contract of sale ought to be certain, fair, and just, in all its parts ; and if any of these ingredients were wanting in the case, the Court would not decree a specific performance. It was in the discretion of the Court, whether they would decree a specific performance ; otherwise, a decree might be made which would tend to the ruin of one party." In this, he pursues the sense of Lord *Hardwicke*, (3 *Atk.* 385-6) most strictly and fairly ; and uses words which are not found in the quotation of counsel in *Mortlock* v. *Buller.* He does not profess to quote his Lordship literally ; and yet stands perfectly clear of the imputation that he took the case at second hand through the counsel. Whether the Chancellor mistook the case itself, is another question. He is said to have done it, because a previous part of Ld. *Hardwicke's* opinion relates to the specific execution of contracts for goods and chattels ; and it is insisted, that the part relied on by the Chancellor relates to the same subject, and should not have been quoted as general, or applicable to contracts for the sale of lands. Ld. *Hardwicke* does, indeed, speak of goods and chattels in one part of his opinion ; and reasons against a specific execution of contracts, in relation to them, on the ground of their frequent fluctuation in value—(the very reason, by the by, which counsel here give for enforcing contracts concerning lands,) and he then thinks, that the party may come, in that case, within the rule as to lands ; and states what the general rule in relation to these is : declaring also that, with one exception, it is the same as to both lands and chattels. The amount of that case is, then, as stated by the Chancellor. In *The City of London* v. *Nash* (1 *Ves.* 12) Lord *Hardwicke* said, in so many words, " the most material objection for the defendant, and which has weight with me, is, that the Court is not obliged to decree a specific performance, and will not, where it would be a hardship.

*Underwoood* v. *Hitchcox*, (1 *Ves.* 279) is admitted to be a case in point for the Chancellor's opinion. There the uncle articled to sell a copy-hold estate to his nephew, the

defendant, who articled to sell to the plaintiff. The estate was then surrendered by the uncle, to the nephew, his wife and family ; and it was contended, that the nephew's taking a conveyance in this form was a breach of trust, and that he should convey notwithstanding; and that the purchaser might go back to the uncle as trustee. Ld. *Hardwicke* said, " The rule of Equity in carrying agreements into specific execution is well known; and the Court is not obliged to decree every agreement entered into, though for valuable consideration in strictness of law, it depending on the circumstances. And, undoubtedly, every agreement, of which there should be a specific performance, ought to be in writing, certain and fair in all its parts, and for adequate consideration." Again : " Nor was the consideration adequate between the uncle and nephew ;" and he expressly declared, that for this inadequacy, both between the uncle and nephew, and the nephew and the plaintiff, a specific performance should not be decreed. Lord *Hardwicke*, then, considers a bargain for an inadequate consideration a hard bargain, within the rule which makes hardship a cause for denying a specific performance. Counsel will certainly not complain, that treating *inadequacy* and *hardship* as synonomous in this case, is novel or extraordinary, after seeing that such a Judge as Ld. *Hardwicke* has done the same thing, of whom it is said, he sat 30 years in the Court of Chancery, and never had a decision reversed by the House of Lords. Lord *Erskine* cites, and relies upon this case, in *Mason* v. *Armitage*, (13 *Ves.* 37.) *Faine* v. *Brown*, cited in *Ramsden* v. *Hylton*, (2 *Ves.* 304) also relied upon by the Chancellor, went upon the same kind of hardship. It is true, this case depends upon the citation of counsel ; and a reliance upon it is said to be dangerous, for that reason ; but this is by no means the first instance in which it has been relied upon. The same case was quoted in *Howell* v. *George*, (1 *Mad. Rep.* 1) and *Revell* v. *Hussey*, (2 *Ball & Beatty*, 287) and the same doctrine will be found in *Gilb. Lex. Pret.* and in *Franks* v. *Martin*, (1 *Eden's Rep.* 323.) In *Vaughan* v. *Thomas*, (1 *Br. Ch. Rep.* 556) specific performance was denied by the Chancellor, because, as he said, it would be giv-

ing aid to a very unconscientious bargain, the question turning upon the value of the annuity, which was the subject of purchase ; and in *Collet* v. *Wollaston*, (3 *Br. Ch. Rep.* 228) an inquiry into value was directed, before the Master of the Rolls would decree a performance, the reversion appearing to have been sold for a very low price.

*Day* v. *Newman*, (2 *Cox*, 77) it is said, depended on other circumstances besides inadequacy ; but none such are relied upon in the decision. Indeed, they are expressly excluded by Lord *Alvanley*, Master of the Rolls, who decided that cause. At page 80, he makes the general distinction for which we contend, between a bill to set aside, and one to enforce a contract. He asks, " Is, then, this such an inadequacy of price as will induce the Court to set aside the contract, or, at least, not to enforce it ? These are the two questions. The inadequacy of price is certainly great, but I am not prepared to say, that it is sufficient to induce the Court to make the party deliver up the contract ; but, I am satisfied, it is a sufficient reason to induce the Court not to decree a specific performance ;" thus relying on inadequacy expressly. At page 81, he denies that there was any hardship, independent of this ; and, at page 82, " I am, therefore, bound to look into that second cause ; and there I find that a bargain was made for buying an estate, at a very inadequate price—so enormous that all mankind must, at the first mention of it, concur in thinking it so. If I had any doubt about the inadequacy of price, I would put it in some mode of inquiry ; but, as the case stands, the value is £9000 ; and then the question is, whether a young man, in this Court, shall be holden to a bargain like this ?" *Howell* v. *George*, (1 *Mad. Rep.* 1) again recognizes hardship as a defence. In *Mad. Ch. last ed.* 405, it is said, " a defendant will not be compelled to perform an *unreasonable* contract ;" which is a correction ; for the word was omitted in the corresponding passage of the first edition, though the author inserted it in page 336 of that edition, relative to the same subject.

In *Clitherall* v. *Ogilvie*, (1 *Dess. Eq. Rep.* 257) the principles for which we contend are explicitly asserted.

The case is stated to be clear of all fraud, imposition, or misrepresentation, and the question was, whether, under all the circumstances of the case, the Court would decree a specific execution, or leave the party to his remedy at law. The power of the Court was declared to be discretionary; not arbitary, but governed by the rules of Equity; that though there was no fraud charged, yet, in order to entitle the party to a specific performance, it ought to be fair, certain, just, equal in all its parts, and for adequate consideration; that if any of these ingredients were wanting, the Court would not decree performance; and, at pages 258-9, it is said, "though an inadequate consideration may not alone be sufficient to set aside a contract, yet it is a material ingredient, and will go a great way, where the property has been sold for a sum grossly inadequate to its real value. The Court, although it may not go so far as to set aside the agreement, will not, however, lend its aid in compelling a specific performance, but leave the party to his remedy at law, to recover damages for the non-performance." At page 260, "But there is a distinction to be made, between the Court's setting aside an unreasonable contract, after it is executed, and compelling a specific performance of such an one. In the latter case, they will use their discretion with greater liberality than in the former." Again: (261) "Being altogether an executory contract, and the complainant coming here for a specific execution, this Court will not depart from the constant rule in the case of a hard bargain, where it is not absolutely executed but executory only, of refusing to carry it into execution." *Perkins* v. *Wright*, (3 *Harris & M'Henry's Rep*. 324) contains the same general doctrine; and in *Campbell* v. *Spencer*, (2 *Bin. Rep*. 129) the remarks of *Tilghman*, Ch. J. are to the same effect. (*Vid. id. p.* 133.)

In answer to our authorities and arguments, we are told that the doctrine of inadequacy is too vague to be practicable; that the estimate of men as to the value of property is different; and, so long as their opinions and habits of life differ, the rule cannot be safely enforced. But the same difficulty exists in other cases, and must exist in many from the na-

ture of things ? In an action, how can the jury assess damages, except upon the opinion of witnesses ? So, upon questions of fraud or surprize, when sent to a jury for trial, they must labour under the same uncertainty ; and, indeed, saying that this contract might go to, and be passed upon by a jury in reference to the damages, gives up the objection. No matter whether we begin with inadequacy or mistake. Gross inadequacy, too, when relied on as evidence of fraud, must be ascertained in some way. If this cannot be done, when it is small, how is it to be reached when large ? Such questions must rest upon the opinions of men, till Courts are more enlightened than they ever can be. The opposite doctrine would preclude all enquiry into value. We must not expect to arrive at demonstrative certainty ; but take the best lights we can obtain.

It is asked, why send the party to law, when, if there be a legal remedy at all, it must embrace as the measure of damages the value of the property, of which a conveyance was refused pursuant to the contract. I need not remark, that even this admits there must be an inquiry into its value. But we deny that the contract price is the only one by which the jury are to be regulated. The cases cited as to hard bargains shew that the jury may give mitigated damages, according to the reason of the case. If the jury had nothing more to do than look at the contract price, all the Chancellors who have made these decisions must have been in darkness. But the rule is a familiar one at law. (*Bac. Abr. Damages, (D) James* v. *Morgan*, 1 *Lev.* 111. *Thornborough* v. *Whitacre*, 6 *Mod.* 305. *Cutler* v. *How*, 8 *Mass. Rep.* 257. *Same* v. *Johnson, id.* 266. *Baxter* v. *Wales*, 12 *id.* 365.)

As to the cases cited against the doctrine of inadequacy ; *Parker* v. *Palmer*, (1 *Ch. Cas.* 41) is not much relied upon by the gentleman himself. It is, indeed, as he says, very obscure, and does not decide the point. *City of London* v. *Richmond*, (2 *Vern.* 421-3) was a fall of property in value subsequent to the bargain ; and the anonymous case cited by Ld. *Thurlow*, in *Mortimer* v. *Capper*, (1 *Br. Ch. Cas.* 158) was denied to be law, by Sir *Samuel Romilley*, in *Mortlock*

v. *Buller*, (10 *Ves.* 298,) and correctly. Ld. *Thurlow* says, "I remember a case of a contract for a piece of ground, which was to be enclosed for £20, and, upon a bill for specific performance, the defence was, that it was worth £200. And although the contract was to be performed *in futuro*, yet, neither party knowing the value, the Master of the Rolls decreed a performance." It was a case of *gross inadequacy*, and can never be supported. As to the principal case, the agreement was perfectly fair; and the Ld. Chancellor says, in *Mortimer* v. *Capper*, (*p.* 157) "to decree for you, I must lay it down as a rule, that where a bargain depends upon a contingent event, which chance both the parties know, if the event turns out against one of the parties, he must be discharged from his contract." This is clear where the party runs the risque of the contingency; and the final opinion is far from sustaining the gentleman's doctrine. The case was referred to a Master to ascertain the value of the annuity, which was the subject of purchase; and the Lord Chancellor puts it on the fairness of the price. All this will be seen at the close of the case. It virtually overrules the anonymous case cited.

The case of *Adams* v. *Weare*, (1 *Br. Ch. Cas.* 567) is the one principally relied on against us; but it will be found that this case is contradictory and obscure. The vendee purchased with a view to building a mill. The vendor knew nothing of this according to the case; but from Ld. *Thurlow's* opinion, it was plainly in the contemplation of both parties. At page 568, he says he was not very anxious to discuss the point what bargains the Court should execute; that every agreement should be performed unless waived; that the rule should be fixed, and not rest on loose expressions, such as *hard* and *unconscionable*, which expressions, unless properly applied, mean little or nothing. That is true. No words mean any thing unless properly applied. He then goes into the particulars of the bargain; it was objected that, when the bargain was made, the price was three-fourths more than the value; "But," says he, "for aught I know to the contrary, it may be the value." To warrant the erection of the building, consent from the corporation

ALBANY,
April, 1824.

Seymour
v.
Delancy.

of *Bristol* was necessary, and the consent of a Mrs. *Day*; and both parties supposed this might be obtained without difficulty. The vendee agreed to procure it. The value must have been connected with the probability of obtaining it. All the vendee did was to ask Mrs. *Day's* consent; and the Court rely upon this fact; and notice particularly, at *page* 569, where it looks like the main ground; and the Chancellor said, if that consent should be obtained, the plan might yet be carried into effect. It did not appear but that the mill might have been built. had a competent premium been tendered to Mrs. *Day*; and thus the case turned on Ld. *Thurlow's* inability to decide whether the fair value was given or not. If an authority for the other side, it is opposed to his former opinion in *Mortimer* v. *Capper*, (1 *Br. Ch. Rep.* 156.)

It is said *Collier* v. *Brown*, (1 *Cox*, 428) decides the abstract point, that inadequacy is no objection. The Court say (*p.* 431-2) " The parties bargained with their eyes open, and that no imposition or surprise was proved in the case; that *Mary Turner* was very well satisfied with her bargain until she found she could get more for the premises; that, under these circumstances, mere inadequacy of price (where it cannot be used as evidence of fraud) is not, of itself, sufficient to prevent the Court from administering its usual Equity; for if it were, it might be difficult to draw the line, or to say that whenever a better offer is made, it shall not be reason why a former agreement should not be executed." Thus the Court expressly declare that they take the peculiar circumstances of the case as a guide; and they state the circumstances; under which they say inadequacy is not enough. In *Emery* v. *Wase*, (8 *Ves.* 517) Ld. *Eldon* said he did not deny that mere inadequacy, though considerable, was not enough; but, he adds, " very considerable difference in value is not inconsiderable evidence that the contract was not made with great care and attention;" and specific performance was denied on another ground. The *dictum* in relation to simple inadequacy was not called for. In *Coles* v. *Trecothick*, (9 *Ves.* 246,) Ld. *Eldon* said, " Inadequacy is quite out of the question. The cases of re-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

versions and interests of that sort, go upon very different principles. In some, the whole duty of making good the bargain, upon the principles of this Court, is upon the vendee; as in the instance of heirs expectant. Inadequacy of price does not depend upon a person giving *pretium affectionis*, from any peculiar motive, beyond, what any other man would give, the reasonable price." The property was sold for £20,000, and the offer was £25,000; in reference to which, he speaks of the *pretium affectionis*, and says that, "unless the inadequacy of price is such as shocks the conscience, and amounts, in itself, to conclusive and decisive evidence of fraud in the transaction, it is not, itself, a sufficient ground for refusing a specific performance." Inadequacy, as he admits, was really out of the question; and the *dictum* in relation to it was *obiter*. Is it true, as he says, that inadequacy, in order to prevail, must be such as to shock the conscience? He not only travels beyond the case, but beyond the law, as it had been long settled by his predecessors; unless it be understood in reference to the particular case, which was an auction sale. So it must be considered; otherwise it goes beyond his own opinion in *White* v. *Damon*, (7 *Ves* 31.) There *(p.* 35,) he says, " the plaintiff is not affected with any thing beyond suspicion; the sale taking place at an auction, without any fraud, surprise or mistake; the estate being offered upon any price he would bid; and without more he became the purchaser. I am inclined to say, that a sale by auction, no fraud, surprise, &c. cannot be set aside for mere inadequacy of price. It will be very difficult to sustain sales by auction, if this Court will not specifically perform the agreement." He ought to be understood as using language with the same view in both cases. *Livingston* v. *Byrne*, (11 *John. Rep.* 566) lays down the same doctrine.

In *Burrowes* v. *Lock*, (10 *Ves.* 470) a specific execution was decreed, it is true, without regard to inadequacy; but the property in question was already vested in trust. The bargain was executed so far, and the case came within the principle applicable to setting aside contracts. Being executed in trust, refusing to carry it into complete execution

would have been equivalent to setting it aside. *Floyer* v. *Sherard*, (*Ambl.* 18) gives the true solution of that case. " The next objection," say the Court, (*p.* 19) " was, as to our giving relief; for, in many cases, the Court will not set an agreement aside ; and yet not extend any relief. But in the present case, there is no difference between setting it aside, and not giving relief." Again, " In a case of this kind, the Court is as much bound to give its relief, as if it was a legal title, and an action brought at law." So in *Burrowes* v. *Lock*, there was no chance of reaching the case at law ; and, in such case, the refusing to carry into execution, or setting aside, stand upon the same ground. It does not appear, by the case, that there was any covenant upon which the party could have had a remedy at law, or if a warranty of title was implied, there was no question made but the vendor had a complete title; so that this case comes to a question of inadequacy upon an effort to set aside the contract. In *Western* v. *Russel*, (3 *Ves. & Beam.* 187) the Master of the Rolls said, " It is then alledged that the estate was sold greatly below its fair value ; and, upon that ground, there can be no specific performance. Here, again, it is unnecessary to determine, as a general question, whether inadequacy of price might or might not be a ground for refusing performance ; the case before the Court being that of the proprietor of an estate not alleged to have been under any incapacity or deficiency of judgment, or to have been led by accident or design into a misapprehension of the value." This part of his opinion contains all that is material to the case then under consideration. He does not profess to decide upon the ground of inadequacy, but places the decree on entirely a different foundation. Nor does he presuppose that inadequacy was an insufficient ground; but this is connected with surprise. The question of inadequacy, alone, was carefully shunned. Nor was the question decided in *Cadman* v. *Horner*, (18 *Ves.* 10.) The Master of the Rolls said the allegation of inadequacy was shaken by the defendant's own testimony; and he accordingly took this ground. He would not stop to inquire where the weight of authority lay ; but examined the question whether there

was inadequacy in fact. *Kien* v. *Stukeley*, (2 *Br. P. C.* 396, 398) decides that inadequacy alone is a sufficient objection.

But the case of the respondents does not stand upon inadequacy alone. There are other important circumstances interwoven with it, which, in the language of the Chancellor, are sufficient to overcome the scruples of the most cautious mind. The agreement was obtained from an habitual drunkard, and it is in vain to talk of such a man's acuteness in making a bargain. This is a point sufficiently put in issue. The appellant does not pretend that he was surprised with a defence upon this ground ; nor was he, in fact, so surprised. The examination of witnesses was full to this question, by himself, after which he should not be heard to make the objection. (Here the counsel examined the testimony to this point.) That reasonable doubts exist as to the fairness of the transaction, is enough to resist a bill for specific performance. In the language of one of the cases read, " it must be above all objection." It is not necessary, as upon a bill to set the contract aside, that positive unfairness should be shown. The distinction is taken in *Cook* v. *Clayworth*, (18 *Ves.* 12. *id.* 14, *note*,) that the Court will not set aside a contract on the ground of intoxication, unless it was procured by the party who seeks to take advantage of it ; though it is not necessary to establish this fact in order to avoid its execution. In *Dunnage* v. *White*, (1 *Swanston*, 138) even in a contract made with the view to a family arrangement, Sir *T. Plumer* says (*p.* 149, 50,) " of the incompetency of *J. E. L.* there is no satisfactory evidence; the solicitor who attests the deed, proves that he was sober, and under no mental disability ; and with regard to undue influence, the evidence is certainly not sufficient to impeach the deed ; but as to his general description, there is strong testimony, and all on one side, that he was dissolute, illiterate, addicted to intoxication ; that he had recently passed from a low station into the possession of property to which he was not apparently destined ; that his course of life rendered him extremely subject to imposition. Such habits, though not constituting absolute incapacity, lay a ground for a strict

examination, &c." So here, if there was not a total alienation, *Ellison's* faculties must have been impaired, and an inability produced.

But the appellant did not, and could not perform the agreement, at the time stipulated by him, nor during *Ellison's* life time; the *Newburgh* lots being then incumbered to their full value, and there being no waiver of time, or indulgence granted, by *Ellison* in his life time, nor by the respondents since his decease.

One bound to sell in fee simple, must covenant against incumbrances. (1 *Mad. Ch.* 339.) A mortgage is such an incumbrance as to excuse a bargainee from completing his purchase. (*Butler* v. *O'Hear*, 1 *Des. Eq. Rep.* 382. *Judson* v. *Wass*, 11 *John. Rep.* 525.) We are met by the argument, that the mortgage is now paid, and it is enough that the vendor can make a good title at the coming in of the Master's report, or even at the final decree. This position was considered and refuted in *Alley* v. *Deschamps*, (13 *Ves.* 225) where the Chancellor entered into the subject very fully, and pronounced it an extravagant doctrine.

The right should be the same, both at law and in Equity. A Court of Chancery is resorted to merely because the remedy is different; but it must be founded on the same right as the remedy at law. If the party is unable to perform at the day, it is true he may be relieved; and there are two cases in which this may be done. 1. Even where the delay is occasioned by circumstances over which the party seeking an execution has no control, he may be relieved, unless the delay be so great as to amount to an abandonment, if the time of execution is not made material by the contract, or no change of circumstances accrue. In one case of this kind, an act of parliament was waited for, to enable the party to convey, this being necessary to warrant the grant of a reversion from the crown. But 2. Where the party is in fault, the whole depending on him, a different rule prevails. This point was considered in *Kien* v. *Stukely*, (*Gilb. Rep.* 155.) In *Fordyce* v. *Ford*, (4 *Br. Ch. Cas.* 494) the performance was placed on the ground of acquiescence, and there was no

considerable delay; but the Master of the Rolls denied that a vendor was to take his own time.

It is said, the appellant is without remedy at law, in this case, from the lapse of time. If so, it was his own fault. I refer to *Lloyd* v. *Collet,* (4 *Br. Ch. Cas.* 469 ; 4 *Ves.* 689, 690, *note* (*b*) *S. C.*) In the latter book, Lord *Loughborough* is reported to have said, " There is nothing of more importance than that the ordinary contracts between man and man, which are so necessary in their intercourse with each other, should be certain and fixed ; and that it should be certainly known when a man is bound and when not. There is a difficulty to comprehend how the essentials of a contract should be different in Equity, and at law. It is one thing to say, the time is not so essential that in no case, in which the day has by any means been suffered to elapse, the Court would relieve against it and decree performance—The conduct of the parties, inevitable accident, &c. might induce the Court to relieve. But it is a different thing to say, the appointment of a day is to have no effect at all, and that it is not in the power of the parties to contract that if the agreement is not executed at a particular time, the parties shall be at liberty to rescind it. In most of the cases, there have been steps taken. Is there any case in which, without any previous communication at all between the parties, the time has been suffered to elapse ? I want a case to prove, that where nothing has been done by the parties, this Court will hold, in a contract of buying and selling, a rule that certainly is not the rule at law, that the time is not an essential part of the contract. Here no step has been taken, from the day of the sale, for six months after the expiration of the time at which the contract was to be completed. If a given default will not do, what length of time will do ? It is true, the plaintiff must have considered himself bound after the day. So he was. He could not take advantage of his own neglect. He says, ' by my own default this contract is void in law—I cannot succeed at law—on the contrary, the other party is entitled to recover back the money he has paid in expectation of the execution of his contract—therefore, an equity arises to me.' An equity out of his own neg-

lect! It is a singular head of equity." So, in this case, the party is not able to perform, because he does not make himself so. In *Benedict* v. *Lynch*, (1 *John. Ch. Rep.* 370, 375) the Chancellor acknowledged the rule as laid down by Ld. *Loughborough*, and repeats and adopts it in terms; and (*p.* 375) he declares the general rule to be, that a party coming after the day for performance, cannot be heard, unless he justify the delay by a substantial excuse; and where he has omitted to perform by the day, without such excuse, and there has been no acquiescence on the other side, he will not be relieved; in support of which he cites *Newland on Contracts*, 342, and *Sugden's L. of Vend.* 3d *Lond. ed.* 268; *Milward* v. *Earl Thanet*, (5 *Ves.* 720, *in note*, S. P.)

The only questions are, what was to be performed by the appellant, and whether his omission was excused. He has done nothing; and before he could call for an execution of the contract, he should have put himself in a situation to perform it on his part, by cancelling the mortgage. True, this was done before bill filed; but the appellant should have been ready, in this case, at the day. I cite to this point, *Colson* v. *Thompson*, (2 *Wheat. Rep.* 336, 341.) *Hepburn* v. *Auld*, (5 *Cranch*, 262) was cited by Mr. *Henry*, to shew that time was immaterial; and, it is true, the general doctrine is laid down there, and in *Hepburn* v. *Dunlop*, (1 *Wheat.* 179.) These cases may be supported on the ground of waiver; though they seem more properly to come within the distinction we have advanced, that where the party cannot be able to perform by any act exclusively his own, he shall be excused; but not where the fault arises entirely from his own neglect. Suppose we admit, then, that the appellant's remedy is gone at law; the whole loss is owing to himself. To permit one to claim equity for want of a remedy at law, which he himself has thrown away, would be most extraordinary. The appellant calls on the Court to relieve him, because he has not done his duty. The rule, that Equity will relieve, upon the ground of there being a want of all remedy at law, does not apply. The cases where Equity has disregarded time, are those where the party has lost his remedy, without his own mere neglect. It is, indeed,

a strange equity, as Ld. *Loughborough* said, which is to grow out of the negligence of the party who seeks it.

But suppose, for the sake of argument, that Equity would originally have relieved, under such circumstances ; it will not do so where the specific performance becomes a hardship, from a change of circumstances. The plans for improvement, which w..uld alone prevent almost a total loss of the property, are defeated by *Ellison's* death. His wife and children cannot enter into his commercial views. Take what is said in *Seton* v. *Slade*, (7 *Ves.* 274) for a guide —" The title to an estate requires so much clearing and inquiry, that unless substantial objections appear, not merely as to the time, but an alteration of circumstances affecting the value of the thing, or objections arising out of circumstances, not merely as to time, but the conduct of the parties during the time, unless the objection can be so sustained, many of the cases go the length of establishing that the objection cannot be maintained." Take what is here said, as a criterion—the Court cannot help seeing that here is a change of circumstances. The expectation (if any) of a rise in value, from the establishment of a navy yard at *Newburgh*, is defeated.

The counsel have great difficulty in seeing how, if inadequacy alone be an insufficient objection, it should be different, when taken in connexion with lapse of time, or the other circumstances in the case, any one of which would not, alone, be a sufficient defence. But the Chancellor is not singular in taking this ground. Both *Powell* and *Sugden* take the same view of it, holding that, in all cases, where the price is inadequate, the Court will seize upon delay, connect it with inadequacy, and refuse to interfere upon the two grounds together. (2 *Pow. on Cont.* 229. *Sugden's L. of Vend.* 2d *Am. from* 5th *Lond. ed.* 190.) These authors both think inadequacy alone not sufficient ; but otherwise, when connected with lapse of time. Possession being taken does not vary the case. This was holden in *Savage* v. *Taylor*, (*Cas. Temp. Talb.* 234) cited by the Chancellor. The true principle of this case is contained in the opinion of the Chancellor, and his words, relative to the taking possession, need not be accounted for, by supposing

ALBANY,
April, 1824.

Seymour
v.
Delancy.

that he had some edition of the work not seen by the gentle-man. That it was taken, is evident both from the opinion and the decree. In *Whorwood* v. *Simpson*, (2 *Vern*. 186) *Alley* v. *Deschamps*, (13 *Ves*. 225) and *Rochfort* v. *Creswick*, (2 *Br. P. C.* 296) possessions had also been taken, and, in the two last cases, held a long time ; yet a specific performance was refused.

*S. Jones*, (same side) entered into a very full examination of the cases cited by the Attorney General, vindicated his views, and enforced and illustrated his arguments. He said the doctrine, as stated by the Lord Chancellor, in *Radcliffe* v. *Warrington*, (12 *Ves*. 331, 332) that enforcing specific performance is not a matter of course ; that the jurisdiction is not compulsory upon the Court, but the subject of discretion ; that the question is not what the Court might do, but what it may do under the circumstances, runs through all the cases, to the period of our revolution. It is true, that where the matter is peculiarly the subject of Equity jurisdiction, as a legacy, the Chancellor has no more discretion than exists at law ; because, to exercise it might take away all relief : otherwise, if a remedy may be had in either Court. The exercise of discretion is safe, because the party to whom relief is denied may still go to law. If at the revolution this was the law of *England*, we adopted it by our constitution ; and if it has been shewn that subsequent to this period the English Chancellors followed new rules, this Court were not bound to follow them. He said this not to disparage the decisions of the English Courts. Reason on the other side of the Atlantic is the same as here ; but if the English rule has undergone no alteration with us, it is the safest to abide by it. He agreed, that *obiter dicta* of Lord *Eldon* had thrown doubts upon the question, but nothing more. There is no case, even in *England*, deciding directly that inadequacy is an insufficient objection to a specific performance.

In *Mortimer* v. *Capper*, (1 *Br. Ch. Rep.* 158) a case is cited, and in *P. Wms.* are several cases in which a great change in the value of the property, even after the bargain, was held

ALBANY,
April, 1824.

Seymour
v.
Delancy.

enough to deny a specific execution. And *Ex parte Minor*, (11 *Ves.* 559) will be found a case in which the same ground was taken, even as to an auction sale.

The principle, that a sot is never in a fit situation to do business, is not only sustained by the authorities, but recognized by the statute, (*sess.* 44, *ch.* 109) giving over the management of his affairs to the town officers.

Cases had been cited, to shew that there can be no exercise of discretion, where the remedy was gone at law; but these were cases in which the remedy is exclusively equitable, like *Attorney General* v. *Day*, (1 *Ves.* 218, 221) which related to the execution of an order made upon a Master's report; and the party never could have gone to law. On this ground relief was granted. Talking of discretion does not always pre-suppose an existing present remedy at law. There are cases where it will be exercised, though there be no such remedy. In *Hick* v. *Phillips*, (*Prec. in Ch.* 575) there was none, and yet the Court exercised their discretion in denying a specific performance.

*J. V. Henry*, in reply. I presume it would not have been contended, that the appellant lost all remedy, by default, in not tendering a deed on the 1*st* of *June*, and by not then being in a capacity to convey, if there were no inadequacy in the case. As to the impediment arising from the mortgage, I cite *Pow. on Con.* 266-7, where the author says, " It will make no difference, in respect to performance in specie, although it be evident, from the person's own showing who institutes the suit, that he had not, at the time of entering into the agreement respecting which the suit is preferred, a good title to the hereditaments which are the subject of it." He relies on *Longford* v. *Pitt*, (2 *P. Wms.* 629) where the Master of the Rolls said, " It is enough that the party have title at the time of the decree; which is always the single subject of inquiry on reference." He illustrates his doctrine by the case where an act of parliament was required to make the title perfect.

It is said, there is a distinction between a defect removeable by the act of the party, and some other power; that, in

the latter case, he is more favoured. Why so ? Is not one more blameable, when he contracts to sell an estate in the power of another, than where it is under his own control exclusively ? In *Wynn* v. *Morgan*, (7 *Ves*. 202) the general principle is advanced, that time is not material, in the eye of a Court of Equity, and that it is enough that the party seeking performance have a title at the hearing. I admit it is different, where time is of the essence of the contract, as in the case of the South Sea stock agreements. A want of title is certainly more material than a mere lapse of time for a few days ; and yet it has been uniformly held, that the former should be relieved against. This was so in *Wynn* v. *Morgan*, (7 *Ves*. 202) and in *Mortlock* v. *Buller*, (10 *Ves*. 315) and in *Jenkins* v. *Hiles*, (6 *Ves*. 646) and in *Davis* v. *Hone*, (2 *Sch*. & *Lef*. 352.) In *Day* v. *Newman*, (2 *Cox*, 77) which has been triumphantly cited against us, the Master of the Rolls explicitly declares, (*p*. 83) that lapse of time is no objection. *Clute* v. *Robison*, (2 *John. Rep*. 595, 614) recognizes the same rule. The decree was reversed in that case, upon the express ground that though the party had no title when he first came to perform ; yet the objection was obviated at the time of the decree. *Hepburn* v. *Auld*, (5 *Cranch*, 262) establishes the same point.

That the appellant is without remedy at law, is a powerful reason in favour of a specific performance. At law, the appellant must have averred performance, or a tender of performance, on the 1st of *June*. This was a condition precedent. We could not perform at that day ; and, therefore, our legal remedy is gone. *Newland on Cont*. 89, says, that Courts of Equity afford assistance, as to land or real estate, principally in those cases where Courts of law are incapable of giving to the party the remedy which he seeks ; though, he says, that contracts relating to stocks and personal chattels are an exception. In *Flint* v. *Brandon*, (8 *Ves*. 163) the Master of the Rolls says, " It is only where the legal remedy is inadequate or defective, that it becomes necessary for Courts of Equity to interfere." In *Errington* v. *Aynesley*, (2 *Br. Ch. Rep*. 341) it is said, (*p*. 343) " A specific performance is only decreed where the party wants

ALBANY,
April, 1824.

Seymour
v.
Delancy.

the thing in specie, and cannot have it in any other way." (*Davis* v. *Hone*, 2 *Sch. & Lef.* 347, S. P.) *Mitford*, in his *Treatise on Pleadings*, p. 95-6, advances the same doctrine.

I have given several cases in which it was held, that because the party was remediless at law, he should, therefore, be relieved in Equity. Other reasons are, that several of the respondents are infants. They are trustees ; and, both at common law and by the statute of *Ann*, (1 *R. L.* 148, *s.* 7) the remedy is confined to a Court of Equity alone. This contract is one of exchange. The specific thing is in question ; and the case is distinguishable, in this respect, from most of those where money was the consideration on one side.

I know not what use gentlemen intended to make of 1 *Mad.* 339, as to what covenants are necessary in a deed. We have never refused to give a deed, including all the covenants contemplated by our contract. These are broader than *Ellison* agreed to enter into on his part. In *Butler* v. *O'Hear*, (1 *Dess. Rep.* 382) the party could not make out a title at the hearing ; and *Judson* v. *Wass*, (11 *John.* 525) and *Hasbrouck* v. *Tappen*, (15 *John.* 200) merely shew the strictness which prevails at law. In *Alley* v. *Deschamps*, (13 *Ves.* 225) there was not only a change of circumstances, but the party had lain by for three years, without any excuse of his default. This was held an abandonment, upon the peculiar facts of the case. *Kien* v. *Stukely*, (*Gilb. Rep.* 155) confirms our doctrine that, to make lapse of time material, it must be of the essence of the contract. An intention to pay in South Sea stock was frustrated by delay. That this is the sense of the rule appears also from *Lewis* v. *Ld. Lechmere*, (2 *Eq. Cas. abr.* 20, *pl.* 17.) Time was there deemed material, because the stock fell. Where is the analogy between that and this case ? Here is land of ascertained value. There was stock continually fluctuating in its price. *Lloyd* v. *Collett*, (4 *Br. Ch. Cas.* 469) is remarked upon in *Newland on Contr.* 242. That author says, if considerable time has elapsed, without sufficient reason to excuse the delay, Courts of Equity now decline decreeing a specific per-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

formance, and states *Lloyd* v. *Collett* as illustrative of the position. There were repeated applications, in that case, to perform, and the contract was held to be abandoned. In *Milward* v. *Earl Thanet*, (5 *Ves.* 720, *note b.*) the parties differed as to the construction of the agreement ; and there was a delay of 7 years. That the party must be *ready, desirous, prompt and eager*, as said by that case, is a figurative expression, which means merely that he must not be negligent. Possession was delivered in the present case. There was a part execution. *Colson* v. *Thompson*, (2 *Wheat.* 336) was a case of gross neglect, in not effecting a survey. *Hepburn* v. *Dunlop*, (1 *id.* 179) says nothing about the lapse of time, but contains the principle, that if the title be good at the decree it is enough. *Sugden*, 190, is, I admit, against us, if the text were to stand by itself ; but the cases on which it is bottomed are of contracts where either time was of the essence of the contract, or there was fraud or abuse of confidence. To have been borne out by the cases as to time, he should have qualified his rule, by providing that it should be of the essence of the agreement. 2 *Powell on Contr.* 229, 230, presents a class of cases where the contract should not have been executed, even if there had been no delay. *Rochfort* v. *Creswick*, (2 *Br. P. C.* 296) was tried by the rule as to fairness and honesty ; and in *Harrington* v. *Wheeler*, (4 *Ves.* 686,) cited also in *Newland* on *Contr.* 243 & 244, there was a lapse of 6 years ; no act done towards execution, and, in the mean time, the vendor had agreed to convey to a third person. *Benedict* v. *Lynch*, (1 *John. Ch. Rep.* 370) is also cited. It will merely be necessary to read the caption of that case to see that it cannot apply. The agreement was declared to be void, in terms, by the parties ; and the Chancellor relies upon this express provision. He thinks that the parties may make the time material by express agreement, though it had been formerly held otherwise ; and he also relies upon the fact that there was no excuse for the delay. The want of this excuse is included in his general rule laid down at *pages* 375, 376. That rule is correct. It excepts a case of acquiescence. We are suffered to remain in possession without objection ; and fall directly within the quali-

ALBANY,
April, 1824.

Seymour
v.
Delaney.

fication. He afterwards repeats the same idea ; and the case has no application, until it be shown that *Seymour* has released his claims. So far from this, here was a cotemporaneous delivery of possession by both parties. We say that where the time slips by, being of the essence of the contract, it is never an objection to a specific execution, unless the party, who alone can be injured, promptly refuses to complete the purchase on this ground. *Hick* v. *Phillips*, (*Prec. in Ch.* 575) was an effort to impose copyhold upon the party instead of freehold. *Hanger* v. *Eyles*, (21 *Vin.* 540, (*A*) *pl.* 1, 2 *Pow. on Cont.* 230, S. C.) was an utter incapacity to convey at the day ; and *Pincke* v. *Curteis*, (4 *Br. Ch. Rep.* 328, *Newland on Cont.* 231, S. C.) was not only an omission at the day, but this was followed by communication between the parties, and there was no effort to procure a performance, and no acquiescence in the delay by the party injured, yet a performance was decreed. *Newland*, (*p.* 246,) states the case of *Guest* v. *Homfray*, (5 *Ves.* 818) too strongly. The cases stated by him are mostly of auction sales, where time is material ; and the case from 5 *Ves.* 818, admitted delay as an objection, because no title could be made out ; and the vendee, for that reason, declined going on.

On the whole, the cases are not opposed to the doctrine for which we contend. In no case, where time was not of the essence of the contract, has a short delay been holden any objection, especially if imputable to an incumbrance, or want of title, which may be removed. A bill cannot be filed till after the day passes. If delay be a sufficient objection, why all this doctrine in relation to lapse of time ? The party may always file his bill at a short day, as was done in this instance ; and if the incumbrance is removed before the decree, it is enough. *Ellison* is in fault as much as *Seymour*. The former took no step towards a performance of the contract, though he did no act to disaffirm it.

Shall the incumbrance and delay, then, though nothing in themselves, become effectual when added to inadequacy, which is also nothing ? and, when taken together, make a whole, which is to constitute a defence ? It would be like adding and giving effect to a series of cyphers.

Occasional intoxication is no defence, unless it has result-
ed in a total prostration of the mind. (1 *Pow. on Cont.* 29, 30.)

*Jones.* We do not rely upon occasional intoxication as
constituting an objection. Our position is, that habitual in-
toxication, producing mental debility, disqualifies the party
to contract, the same as any other disease of the mind.

*Henry.* *Cook* v. *Clayworth*, (18 *Ves.* 12) contains the
whole doctrine upon this subject; and I shall content my-
self with referring to that case. The note at *page* 14 of
that book is relied on against us ; but when this speaks of in-
toxication as a disability, it means a state of actual intoxica-
tion at the time of the contract. Habitual intoxication, or
mental disability from any other cause, is not proved.

These parties, then, stood on a footing of perfect equality,
so far as capacity and means of judging were concerned ; and
is it to be tolerated that mere inadequacy, not sufficient to
evince fraud, shall defeat a bill for specific performance ?
The consequences would be monstrous. A large land hold-
er sells to a farmer at $1 per acre payable by instalments.
The day of paying one of these instalments passes ; and the
land was in fact worth $2. Shall the vendor have it in his
power to decline a conveyance upon such ground ? One
wishing to exchange a commercial for an agricultural life,
selects his residence, and purchases of the farmer, at $40
the acre, what was worth but $20. On becoming sick of
his bargain, may he be off ? This is a plain case of the
*pretium affectionis ;* and yet the Chancellor's doctrine allows
a place for repentance. This is inadequacy, *per se.* The
same rule must be extended to large speculations in cities
where the price of the subject falls. The only safe rule is
the one for which we contend, that the inadequacy must be
such, *per se,* or connected with other circumstances, as
shall be proof of fraud ; otherwise, what shall be the stand-
ard in a country where real estate fluctuates in value as it
does here ? Allowing the objection, of inadequacy *per se,*
makes the Chancellor the arbiter of every bargain.

I propose briefly to examine the cases on this subject, as
they arise in chronological order. *Parker* v. *Palmer,* (1 *Ch.*

*Cas.* 42) is not, as supposed by gentlemen, given up. It is not, as supposed, barren of fact. It is a strong case. The execution of a mere bet upon contingency was decreed, though inadequacy was conceded. *Phillips* v. *Bucks*, (1 *Vern.* 227, 229) lays down a general position which runs through a number of cases ; but there had not been fair and open dealing. *Berny* v. *Pitt*, (2 *Vern.* 14) was an unconscionable bargain with an heir for his expectancy ; and in the *Marquis of Normanby* v. *Berkly*, (5 *Vin.* 539) not a single fact is stated ; and the general position taken is, what we admit, that the contract must be fair. It is supposed that a jury might mitigate the damages. So far it is not law ; and the whole case is rendered of doubtful authority by such a position. A jury cannot mitigate, unless the contract betrays absolute folly. Even there, the rule prevails in no case except where there is fraud or imbecility. *Green* v. *Green*, (5 *Vin.* 538, *pl.* 19) was a dealing in relation to a mere expectancy, and yet the Court refused to set it aside. *Young* v. *Clerk*, (*Prec. in Ch.* 538) illustrates the danger of depending for a guide upon the general rules laid down in cases, without going to the circumstances. We are told, on the authority of this case, that the contract must be free from all exception, by reason of under value. The Lord Chancellor said, that the contract was unreasonable, or founded in fraud, and dismissed the bill, and left the party to law. The facts shew fraud—viz. a concealment of the leases—a palpable *suppressio veri*, one branch of the very definition of fraud. It is not a case of mere inadequacy, though it was relied on as such, and is, undoubtedly, a leading case upon which the doctrine contended for on the other side is founded. In 5 *Vin.* 533, *pl.* 32, will be found a string of cases, from Lord *Harcourt's* manuscript tables, containing the principle that Equity will not carry unreasonable agreements into execution. At page 538, *pl.* 21, a specific execution was denied, because the plaintiff had shuffled, and a distinction was drawn, which runs through all the cases, between stock and land contracts, and the reason is given. The same page, 548, *pl.* 9, says, " Contract for S. S. stock, at an unreasonable price, set aside," referring to

ALBANY,
April, 1824.

Seymour
v.
Delaney.

the case of *Thompson* v. *Harcourt*, (2 *Br. P. C.* 415.) The result given is inaccurate ; and it shews how little reliance can be placed upon these manuscripts. *Rochfort* v. *Creswick*, (2 *Br. P. C.* 296) respects the fairness of the agreement ; one of the qualifications of the rule which we laid down in the opening. *Kien* v. *Stukely,* (*Gilb. Rep.* 155) was a contract for lands, at 40 years purchase, which were not worth more than 15. The intention was, to pay in South Sea stock, and a specific execution was denied, on the ground that the time had elapsed, and the stock fallen. That was a case where time was of the essence of the agreement.

Gentlemen persist, that *Thompson* v. *Harcourt*, (2 *Br. P. C.* 415) is correctly considered by the Chancellor a mere case of inadequacy. What we say is, that he should not have placed it on the ground of inadequacy alone. The contract, in that case, could not have been executed at the opening of the books, and the vendor could never, therefore, have succeeded at law; yet the Court say to the purchaser upon a bill for execution, " You shall pay at the rate of 920 per cent. on the £290 ;" and leave the case there. The contract was not only executed, but this was done by the halves. *Powell*, a man of deep learning, in his treatise on contracts, (2*d vol. p.* 232) says, of this case, that the execution of the contract was decreed by Chancery, on the ground that a subsequent change in value or circumstances could not impair its validity, and that this decree was affirmed in the House of Lords. He does not, therefore, understand it as the Chancellor does. This case was decided in 1722. Now I refer to *Squire* v. *Baker*, (5 *Vin.* 549, *pl.* 12) decided in 1726, only 4 years after, where it is said, " A written agreement being unreasonable, the Court would not carry it into execution, but decreed that it be delivered to the party for whose benefit it was designed, that he may have an opportunity to make the most of it at law." Now, I ask, how does this last consist with *Thompson* v. *Harcourt ?* Yet the Chancellor cites both cases as supporting the same position. *Savage* v. *Taylor*, (*Cas. Temp. Talb.* 234) went upon the unfairness of the party, and the facts will be seen

clearly to warrant that ground. Inadequacy is not even mentioned. *Barnardiston* v. *Lingwood*, (2 *Atk.* 133) contains the general proposition only, that the bargain being hard is an objection to a specific performance. But the agreement was made while the vendor was in distress, and there was, in fact, misapprehension. The Court say, if the agreement had been fair they would have decreed a conveyance. Accordingly, in *Goring* v. *Nash*, (3 *id.* 187, 188) it is said, the discretion which the Court exercises is not arbitrary, but referrible to general rules. *Buxton* v. *Lister*, (3 *id.* 386) is relied on against us ; but it merely reiterates the general rule, that the agreement should be *certain*, *fair* and *just*. This was a case of personal property. In *Joynes* v. *Statham*, (*id.* 388) there was circumvention. The same spirit pervades the whole of Lord *Hardwicke's* decisions. See, also, *City of London* v. *Nash*, (*id.* 512 ; 1 *Ves.* 12, S. C.) where a specific execution was holden oppressive, and an issue directed to ascertain the damages. In *Underwood* v. *Hitchcox*, (1 *Ves.* 279) he says, " the rule, that decreeing specific performance is discretionary, is well known ; that to warrant this, it should be in writing, fair in all its parts, and for adequate consideration." This case depends particularly upon the policy of the English Courts, who give all possible effect to family settlements. At *p.* 280, it is treated upon this ground, and said, the estate was intended by the uncle as a benefit to the defendant and his family.

*Faine* v. *Brown*, cited by counsel in 2 *Ves.* 304, was a case where, if a stranger had been a purchaser, the vendor would have lost half his estate. To decree a specific performance would have been equivalent to decreeing a penalty. Beside, the vendor was intoxicated at the time. In 1 *Fonbl.* *Newland* and *Powell*, this case is not mentioned at all, with reference to the question of inadequacy. If the purchaser had been the brother himself, Ld. *Hardwicke* would still have told him he was a volunteer, and not entitled to relief. *Pope* v. *Roots*, (7 *Br. P. C.* 184 ; 1 *id.* 370, *Toml. ed.*) is not law. It will be seen, by 2 *Pow. on Contr.* 76, 62, and *Newl. on Con.* 32, 3, 4, 5, that it has been overruled in its broad sense, and has resulted in this, that no after inequality can prevent a

ALBANY,
April, 1824.

Seymour
v.
Delaney.

specific performance, if the contract was for adequate consideration when made. *Mortimer* v. *Capper*, (1 *Br. Ch. Cas.* 156) before cited, proves this rule conclusively. The bargain was fair, and though the inadequacy was great, it was executed. *Heathcote* v. *Paignon*, (2 *Br. Ch. Cas.* 175) repeats the doctrine, reviews the last case, and speaks of resting the question of specific performance on the market price, as an absurdity. It takes the difference between the effect of mere inadequacy, and the evidence arising from gross inadequacy. It is said, " Here is no evidence of distress—nothing but inadequacy of value—and if that could be made the rule, the least circumstance which varied the next case which occurred might make the difference ;" thus giving the rule for which we contend, in the most luminous manner. The parties stood on equal ground : the contract should have been executed, and it was executed accordingly.

*Day* v. *Newman*, (2 *Cox*, 77) is correctly relied upon, as giving force to the objection of simple inadequacy. Lord *Alvanley* and Lord *Rosslyn* are noted, as being the only Chancellors who had recognized this doctrine, or attempted to break in upon the opposite rule. (*Newland on Contr.* 66.) To my mind there was evidence of overreaching in the vendor, and imbecility in the vendee. It was, in fact, a case of constructive fraud, arising from inadequacy and overreaching, though Lord *Alvanley* chooses to deny this, and places the case upon the foundation of simple inadequacy. Yet, in the same year, (1788) a correct view of the subject had been taken by the Court of Exchequer, in *Collier* v. *Brown*, (1 *Cox*, 428.) In that case it was insisted, (*id. p.* 431) that inadequacy alone was an objection, but denied by the Court, in so many words, and the rule stated as we contend for it. *Collet* v. *Wollaston*, (3 *Br. Ch. Cas.* 228) decided in 1791, was an agreement to assign stock ; and by leaving the party to law he would get the value. *Perkins* v. *Wright*, (3 *Harris & M'Henry*, 324) quoted by gentlemen, is plainly not law. It even goes the length of impeaching the contract, from a subsequent accidental change of value ; against which the rule is now clearly settled, by cases respecting annuities, destruction by fire, or by

ALBANY,
October, 1824.

Seymour
v.
Delancy.

earthquakes. (*Poole* v. *Shergold*, 2 *Br. Ch. Cas.* 118. *Jackson* v. *Lever*, 3 *id.* 605.)

*White* v. *Damon*, (7 *Ves.* 30) was an auction case. Lord *Rosslyn* had decreed against a specific performance, on the ground of inadequacy ; and Lord *Eldon* denies his doctrine, going on the ground that it is an auction sale ; but the broad proposition which he lays down after this, denies the objection of general inadequacy. *Flint* v. *Brandon*, (8 *Ves.* 163) has no application ; but in *Emery* v. *Wase*, (*id.* 505, 517) Lord *Eldon* confirms his former doctrine, saying that mere difference of value, though considerable, is no objection. The refusal to decree an execution, in that case, was on the ground that the Court will never compel the husband to exercise his authority over his wife for that purpose. Again : in *Coles* v. *Trecothick*, (9 *Ves.* 246) Lord *Eldon* says, inadequacy does not depend on one's giving *pretium affectionis*, and to make it available it must be such as shocks the conscience. The *pretium affectionis* does not mean attachment merely, but any peculiar motive which leads to a purchase, even for the sake of selling again. The odious appellation of fraud can never be applied to such speculations. Try the rule by this case. Admitting that *Ellison* purchased with a view to the navy yard, and was disappointed, and allowing that he gave too much, should a specific execution be, therefore, denied ? Sir *Samuel Romilly*, in citing *Tilly* v. *Peers*, (10 *Ves.* 301) from his own notes, adds to what is mentioned by the Chancellor, of that case, that on a cross bill it appeared to be a case of clear fraud ; and it is on the latter ground that we must take performance to have been denied. *Mortlock* v. *Buller*, the principal case, beside being one of an auction sale, went on the ground that the agent had no power to sell, and had imposed upon the trustees. There would have been a breach of trust, also, had the trustees conveyed. It is the rather to be inferred, that the case cited by Sir *Samuel Romilly* went on the ground of fraud disclosed in the cross bill, because in *Western* v. *Russell*, (3 *Ves. & Bea.* 187, 190, *A. D.* 1814) he denied that inadequacy is a defence, and says he pressed it in vain in *Mortlock* v. *Buller*, and *it never had been holden sufficient.*

I forgot to notice, in the order I had prescribed to myself, the case of *Adams* v. *Weare*, (1 *Br. Ch. Cas.* 568) decided in 1784, which was a case of 60 years purchase, upon the faith that the vendee could make the subject worth what he gave, by obtaining certain mill privileges.   The inadequacy was plain, but as there was no evidence of fraud or mistake, a specific execution was decreed, and the Chancellor lays down our rule, strongly.

*Mason* v. *Armitage*, (13 *Ves.* 25) merely qualifies the rule for which we contend, by admitting a mistake to be a defence.   In *Willan* v. *Willan*, (16 *Ves.* 83) surprise is mentioned as another qualification ; and the Chancellor enters fully into the distinction for which we contend between the force of circumstances which will operate to set aside an agreement, on the one hand, or deny its execution on the other.   *Cadman* v. *Horner*, (18 *Ves.* 10) gives misrepresentation as another qualification of our rule ; and does not touch the question whether inadequacy is a defence, *per se*. In *Buckle* v. *Mitchell*, (*id.* 111) Sir *W. Grant*, Master of the Rolls, says, "a contract for a purchase is an equitable title ; and the person having such title is, in Equity, to most purposes, considered as the complete owner of the estate.   It is true that Equity does not in every case lend its aid to carry a contract for a purchase into execution ; but it does not arbitrarily execute one contract and refuse to execute another. Some ground must be laid to prevent the party from obtaining, in this case, the assistance which the Court usually gives in cases of the same general description."

*Western* v. *Russell*, (3 *Ves. & Bea.* 187) is a case parrallel with the present in all its features.   The marginal note is this : " Inadequacy of consideration no ground for resisting the execution of a contract to sell ; the vendor not being under any incapacity, deficiency of judgment, or led by accident or design into a misapprehension of the value."   Sir *Samuel Romilly* denies, *arguendo*, that inadequacy is a defence ; and Sir *W. Grant*, Master of the Rolls, says, virtually, that inadequacy of price cannot be urged where every thing is perfectly fair ; but that it can be used only as auxiliary to other proof of fraud, incapacity, or the like.   These

being out of question, he refused to consider inadequacy. The inadequacy there was very great. We come within the precise terms of that case, except that the inadequacy here is not near so striking. The case of *Howell* v. *George,* (1 *Mad. Ch. Rep.* 1) proceeded on the ground that the interest of the wife and son were to be affected; and the Chancellor would not compel the defendant to control them. Another ground was the intrinsic difficulty upon the words of the power. The rule is laid down there, generally, that the Court will not decree a specific performance where the case is *hard,* &c. But it really goes on the mistake of the party in supposing that he had an estate in fee when it was only for life; and sanctions one qualification of the rule which we advanced in the outset; that of mistake. In 2 *Powell on Cont.* ed. of 1790, *p.* 228, it is said, " But exorbitancy, uncoupled with circumstances of fraud, has not been determined to be a ground for the Court of Chancery to refuse its interposition on behalf of the vendor of an estate." Not one case can be found except *Day* v. *Newman,* (2 *Cox,* 77) opposed to this position. *Newland on Contracts,* 65 and 66, treats the point as some what unsettled, and considers several of the authorities, which have been cited in the course of the argument.

The case of *Howorth* v. *Deem,* (1 *Eden,* 351) cited on the other side, did not involve the question of inadequacy. It related to a family settlement; and *Johnson* v. *Hill,* (1 *Vern.* 271) was the case of an heir selling his expectancy, which rests on grounds peculiar to itself. *Hick* v. *Phillips,* (*Prec. in Ch.* 575) was cited as a case of over value; but, plainly, it did not go on that ground, though it is true that *Young* v. *Clerk* was there cited; but this was to shew that the Court have a discretion to refuse a decree of performance generally. 1 *Mad. Ch. Rep.* 9, *n.* cites *Faine* v. *Brown* for the same purpose. *Vaughan* v. *Thomas,* (1 *Br. Ch. Cas.* 556) was a case of personal property, and *Collet* v. *Wollaston,* (3 *id.* 228) a case of stock. The 1st edition of *Mad. Chancery* does not, as supposed on the other side, vary substantially from his last, in relation to this subject. The phrase is essentially the same in both editions, because

there was no material change in the principle of the cases upon which that writer relied. *Simmons* v. *Hill*, (4 *Harris & M'Henry*, 252) goes merely to discretion in refusing to decree a specific performance, without placing it on the ground of inadequacy. *Carberry* v. *Tannehill*, (1 *Harris & Johnson*, 224) was a case of youth and great ignorance in the vendor. The Chancellor adverts to these grounds particularly ; and the same remark applies to *Clitherall* v. *Ogilvie*, (1 *Dess.* 250.) In addition to ignorance and youth, there was great preciptancy ; and the inadequacy was gross, so as to evince fraud. The note to that case (*p.* 253,) will show that it does not rest upon the objection of mere inadequacy. *Campbell* v. *Spencer*, (2 *Bin.* 129) is also cited ; but it militates against the gentlemen. The right to a specific execution was, in that case, tried by a jury. There was no great inadequacy ; nor did *Yeates*, J. who tried the cause, hold the contract to be void. He left it to the jury, who found against the contract. There was evidence from which they might have inferred fraud ; and, for this reason, the Court denied a new trial. But they agreed with *Yeates*, J. upon the point of inadequacy. *Franklin* v. *Osgood*, (2 *John. Ch. Cas.* 1) was an attempt to set aside a sale. The case did not call upon the Chancellor for a discussion as to the effect of inadequacy upon a bill to enforce performance. What he said as to this was, therefore, entirely gratuitous. Both, *Pope* v. *Roots*, (7 *Bro. P. C.* 184,) and *White* v. *Nutt*, (1 *P. Wms.* 60) are considered by *Newland* in his treatise on contracts, 85, 86, as shewing that subsequent circumstances of change are no objection, and he gives a variety of instances, farther illustrative of this position ; as the death of one on whose life an annuity depended—destruction by fire, &c. in all which specific execution was decreed. What the Ld. Chancellor says in *Rose* v. *Cunynghame*, (11 *Ves.* 554) confirms this idea. The estate is considered as executed in the vendee ; and the decree operates as a mere confirmation.

Now why go to the jury? Can they mitigate damages in consequence of a change of value ? *Bac. Abr. Damages* (*D*) to which we are referred for this, cites cases of mere cheat, or extreme folly and weakness. But could the jury divide

the loss even if the *Newburgh* lots had been sunk? They have no discretion. They are not arbitrary judges in matters of contract. Could they, in this case, give an amount in damages to the appellant short of the value of the farms, admitting that his remedy at law was good? The measure of the damages is the worth of the thing, on the day when the conveyance was to be made.

SAVAGE, Ch. J. On the 14*th* day of *January*, 1820, *William Seymour* and *Thomas Ellison* entered into an agreement under seal, by which *Ellison* agreed to convey to *Seymour* two farms in the towns of *Montgomery* and *Wallkill*, in the county of *Orange*, containing by estimation 799 acres of land; and *Seymour* agreed to convey to *Ellison* an equal undivided third part of certain lots in the village of *Newburgh*; the conveyances to be executed on or before the 1*st* of *June* then next. It was further agreed that the parties might respectively take possession of the premises so to be conveyed to them. The parties did take possession accordingly; and, on the 3*d* of *August*, 1820, *Ellison* died without the conveyances being executed. The bill was filed against the respondents, as the heirs of *Thomas Ellison*, to compel the performance of the above contract. It was resisted in the Court of Chancery on three grounds:

1. Inadequacy of price.

2. Debility of *Ellison's* mind produced by habitual intoxication.

3. The inability of the appellant to fulfill on his part.

The Chancellor dismissed the bill on all these grounds, and expressed an opinion that inadequacy of price may, of itself, and without fraud or other ingredient, be sufficient to authorize the Court to refuse its aid in enforcing the performance of a contract for the sale of land; though it might not be sufficient to set aside the contract.

These are the principal points in the case, on which the defence rests. The testimony is very voluminous, and I shall not now enter into a detailed statement of it. The

weight of evidence, in my judgment, establishes the difference in value, between the farms and the lots, at $5000 and

upwards ; and that *Ellison* was, in the month of *January*, 1820, and before and after, of intemperate habits. Some of the witnesses represented him as incapable of doing business ; and others thought him capable, except when intoxicated. It also appears, that, both in *January* and *June*, 1820, the village lots were encumbered by a mortgage to the amount of $5000, and so continued till shortly before filing the bill.

ALBANY, April, 1824.

Seymour v. Delancy.

*Ellison* was of intemperate habits.

It is asserted by elementary writers that the power of enforcing agreements specifically will not be exercised but to subserve the cause of justice ; and that whenever the bargain is a hard one, bordering on oppression ; where there has not been perfect fairness ; where any facts have been concealed which should have been disclosed ; or where any unfair advantage has been taken ; in those cases Equity will not decree a specific performance, but leave the party to his remedy at law. (*Reeve's Dom. Rel.* 386. *Newland on Contr.* 223-4.)

Elementary writers to the 1st point, &c.

The cases in which a Court of Equity decrees specific performance of contracts, are those where damages recovered at law would not answer the intention of the parties in making the contract. (2 *Sch. & Lef.* 347.)

When equity decrees specific performance.

In my judgment, his honor the Chancellor is correct in saying that it is not a matter of course, in all cases, to decree specific performance of contracts. (*Cas. Temp. Talb.* 236. 12 *Ves.* 331. 1 *Ves. Jun.* 566.) It requires the exercise of a sound discretion upon a view of all the circumstances. That discretion must, indeed, not be arbitrary and capricious. It must be regulated upon grounds that will make it judicial. (7 *Ves.* 35.) If the contract has been entered into by a competent party, and is, in its nature and circumstances, unobjectionable, it is as much a matter of course to decree specific performance, as it is to give damages at law. (9 *Ves.* 608.)

This is not a matter of course, but of sound discretion. But when contract is made by competent party, and is unobjectionable, it is as much of course to decree performance, as to give damages at law.

The appellant's counsel maintain that inadequacy of price, alone, is no ground for refusing to enforce a specific performance, unless it amounts to evidence of fraud. The case of *Thompson v. Harcourt*, (2 *Br. P. C.* 415, *A. D.* 1722) is claimed as an authority by both parties. As I un-

Whether inadequacy alone be an objection.

Cases cited by chancellor.

*Thompson* v. *Harcourt*, (2 *Br. P. C.* 415) *A. D.* 1722.

derstand it, it supports the proposition advanced by the appellant's counsel. The case was substantially this, so far as it is applicable here : During the infatuation which prevailed on the subject of the *South Sea* scheme, and on the *18th June*, 1720, *Thompson* agreed with *Harcourt*, that he would, on the next opening of the books of the company, transfer to him £1000 *South Sea* stock, and *Harcourt* agreed to pay *Thompson* £9,200 for it ; which is 920 per cent. The books were opened on the *5th October. Thompson* represented to *Harcourt*, that he had the £1000 ready to transfer, (though, in fact, he had but £290.) And *Harcourt* not being prepared to pay the £9200, another agreement was entered into, by which the time was extended to the next transfer day after *Christmas*, upon certain terms. That day was the *1st May*, 1721, and *Thompson* not having the stock, procured it of another, to be returned on certain conditions. On that day the stock was tendered to *Harcourt*, but refused by him, and then re-transferred to the person from whom it had been procured for the purpose of the tender. *Thompson* then prosecuted at law upon the contract ; and *Harcourt* filed his bill to be relieved against it. In the mean time the bubble had burst ; and it was enacted by parliament that all contracts for the sale and purchase of the stock, unperformed on the *29th September*, 1721, where the seller had not the stock on the day of the contract, or within six days after, should be void as to so much as the seller was not possessed of. *Thompson* then filed a cross bill, praying a specific performance. Both causes were heard at the same time, and the Court decreed that *Harcourt* should pay *Thompson* 920 per cent. for the £290 stock which he actually held of his own. This decree was on the bill for relief ; and the cross bill, which was for specific performance, was dismissed without costs. *Thompson* appealed because he was not allowed the 920 per cent. on the whole £1000 ; but the appeal was dismissed, and the decree affirmed. The only reason why the 920 per cent. was not allowed, on the whole, must have been because he was the owner of stock to £290 only. The decree proceeded upon the act of parliament. So far as the Court acted on the contract, they

must be understood as decreeing a specific performance. In that case there was no pretence of fraud or circumvention. It seemed to rest on inadequacy only ; and that arising from subsequent circumstances; the stock being worth 920 *per cent.* at the time of the contract. There were other facts and points in the case to which I have not referred, as they have no bearing on the present question.

In *Barnardiston* v. *Lingwood*, (2 *Atk.* 133) *Barnardiston*, being distressed for money, conveyed to *Lingwood*, his (*B's*) interest, being a remainder in tail after the death of his uncle, worth £300 per annum, for the sum of £300. A bill for relief was filed, and a cross bill for a specific performance. Ld. *Hardwicke* dismissed the cross bill ; and says that in the case of a hard bargain, when it is not absolutely executed, but executory only, the constant rule of the Court is not to carry it into execution.

In *Buxton* v. *Lister*, (3 *Atk.* 383) the bill was to enforce a contract for timber sold at £3050, when it was worth no more than £2500. Ld. *Hardwicke* objected, at first, on the ground that the thing in controversy was a chattel ; but finally decided on the merits ; and dismissed the bill upon the ground of hardship without costs, on *Buxton* giving up the agreement ; saying that if he was to dismiss it *upon the misrepresentation* (which was fully shewn) he would dismiss it with costs. In the course of his remarks, he uses the language quoted by his honor the Chancellor, " that nothing is better established, than that the Court will not decree a performance of an agreement, unless it is fair and just in all its parts ; and that it is in the discretion of the Court whether they will decree a performance."

In the same year, (1746) the cause of *Joynes* v. *Statham* came before him, on a bill for a specific performance of an agreement for a lease of a house, which was signed by the defendant only, and contained a stipulation to pay £9 rent, yearly. The defendant insisted, and offered to prove, that the agreement should have been, to pay the rent clear of taxes ; but the plaintiff, who wrote it, omitted that clause. Lord *Hardwicke* admitted the evidence, observing, " that the constant doctrine of this Court is, that it is in their dis-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

*Barnardiston*
v. *Lingwood,*
(2 *Atk.* 133)
*A. D.* 1740.

*Buxton* v. *Lister,* (3 *Atk.* 383,) *A. D.* 1746.

*Joynes* v. *Statham,* (3 *Atk.*) 388) *A. D.* 1746.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

*City of Lon-
don v. Nash,* (3
*Atk.* 512) A.
D. 1747.

*Underwood v.
Hitchcox,* (2
*Ves.* 279) A.
D. 1749.

*Mason v. Ar-
mitage,* (13
*Ves.* 37) A. D.
1806.

*Faine v.
Brown,* (cited
2 *Ves.* 307) A.
D. 1750.

cretion whether, in such a bill, they will decree a specific performance, or leave the plaintiff to his remedy at law."

In *The City of London* v. *Nash,* (1 *Ves.* 12 ; *more fully reported* 3 *Atk.* 512) Lord *Hardwicke* refused to decree specific performance, on the ground that the Court is not obliged to do this, where it will be attended with great loss and hardship to one of the parties. The bill, in that case, claimed a performance of an argreement to new build certain houses, which the defendant had agreed to do, but, instead of building, had thoroughly repaired them. It is also observed that, even if the defendant intended to evade his contract, still a specific performance would be hard, and all that the city wanted was to be compensated in damages. The Chancellor, therefore, directed an issue.

In *Underwood* v. *Hitchcox,* (2 *Ves.* 279) Lord *Hardwicke* says, the rule of Equity, in carrying agreements into a specific performance, is well known ; and the Court is not obliged to decree every agreement entered into, though for valuable consideration in strictness of law, it depending on the circumstances. And, undoubtedly, every agreement, of which there should be a specific performance, ought to be in writing, certain and fair in all its parts, and for adequate consideration. And he refused, in that case, to decree performance, because it was *too hard* to decree the defendant to make a surrender of the copy-hold estate, (which was the thing in controversy) for so inadequate a consideration. He referred to the rule laid down in *Attorney General* v. *Day,* (1 *Ves.* 220) where he says that decreeing performance is discretionary, when the party has his election of two remedies, in Equity, or at law ; and, even if there is no other remedy, it should not be done, if there are strong and material objections against it. Lord *Hardwicke's* rule was recognized by Lord *Erskine,* in *Mason* v. *Armitage,* (13 *Ves.* 37.)

The case of *Faine* v. *Brown,* cited by counsel in *Ramsden* v. *Hylton,* (2 *Ves.* 307) was admitted to be an authority supporting the Chancellor's decree, if it was correctly stated. Lord *Hardwicke,* in that case, said that, independent of the circumstance of intoxication when the contract was

entered into, the hardship, alone, of losing half the purchase money, if carried into execution, was sufficient to determine the discretion of the Court, not to interfere, but leave the parties to law.

In *Day* v. *Newman*, at the Rolls, (2 *Cox*, 77) performance was refused, on the ground of inadequacy alone ; but in *Collier* v. *Brown*, (1 *Cox*, 428) decided the same year, (1788) in the Court of Exchequer, though there was some inadequacy of price, a performance was decreed.   An estate, worth £400, or more, was sold for £275.   The price first asked was £300 ; but the owner was not much acquainted with the estate, and supposed she was selling to the tenant, till after the contract was executed.   She was, also, very old ; yet the Court was of opinion, that the parties bargained with their eyes open, and as there was no imposition or surprise in the case, mere inadequacy of price, (when it could not be used as evidence of fraud) was not, of itself, sufficient to prevent the Court from administering its usual equity.

Three years afterwards, the same Court, in *Tilly* v. *Peers*, (cited by Sir *Samuel Romilly*, from his own note, in *Mortlock* v. *Buller*, 10. *Ves.* 301) declared, that laying out of consideration all circumstances of fraud, the Court would not enforce a hard bargain.   We have not the facts upon which the decision was founded ; but it seems, from the remarks of Baron *Thompson*, that it was a clear case of fraud.

*White* v. *Damon*, (7 *Ves.* 30) was the case of property sold at auction, for £1120—worth £2200.   A bill was filed for a specific performance ; and though Lord *Rosslyn* first dismissed the bill on the ground of inadequacy, it was not finally decided on that ground. It was before Lord *Rosslyn*, and afterwards, on a petition for a re-hearing, before Lord *Eldon*.   They both, however, agreed in the general proposition, that it is not a matter of course to carry an agreement into execution, but rests in discretion.

In *Coles* v. *Trecothick*, (9 *Ves.* 246) Lord *Eldon* declared, that unless the inadequacy of price is such as shocks the conscience, and amounts in itself to conclusive evidence of fraud in the transaction, it is not a sufficient ground

ALBANY,
April, 1824.

Seymour
v.
Delancy.

*Day* v. *Newman*, (2 *Cox*, 77) *A. D.* 1788, *and Collier* v. *Brown*, (1 *Cox*, 428) *A. D.* 1788.

*Tilly* v. *Peers*, (*cited* 10 *Ves.* 301) *A. D.* 1791.

*White* v. *Damon*, (7 *Ves.* 30) *A. D.* 1801 -2.

*Coles* v. *Trecothick*, (9 *Ves.* 246) *A. D.* 1804.

*ALBANY,*
*April, 1824.*

*Seymour*
*v.*
*Delancy.*

for refusing a specific performance. He had just been re-capitulating the facts. It was a case of sale of real estate, by an auctioneer, and *Trecothick* had surveyed the premises, and valued them at £23,000—had told the auctioneer not to sell for less than £19,500—and had agreed they should go for £20,000 ; but he refused compliance with the contract, because another offer of £25,000 had been subsequently made ; and if the declaration of his Lordship was made in allusion to those facts, it certainly cannot be questioned.

*Mortlock* v.
*Buller,* (10
*Ves.* 292) *A.*
*D.* 1804.

The case of *Mortlock* v. *Buller,* (10 *Ves.* 292) was also the case of a sale, by an auctioneer, of an estate for £26,-500, worth £34,900. The question of inadequacy was no-ticed by the counsel, and much discussed. Lord *Eldon* did not decide upon it, but refused the specific performance up-on other grounds. He, however, seems to adopt the doc-trine of Lord *Alvanley,* that the Court is not bound to exe-cute every contract ; that if there was any sort of surprise that made it not fair nor honest to call for an execution, he would not give the extraordinary relief of a specific perfor-mance ; neither would he order the contract to be delivered up ; but would let the purchaser go to law.

*Willan* v. *Wil-*
*lan,* (16 *Ves.*
83) *A. D.*
1809.

So in *Willan* v. *Willan,* (16 *Ves.* 83) the point of inad-equacy was not raised. Lord *Eldon* remarked, that there are many cases where Equity will not disturb an agreement which has been executed, though it would have refused to carry it into execution.

*Western* v.
*Russell,* (3
*Ves. & Beam.*
193) *A. D.*
1814.

In *Western* v. *Russell,* (3 *Ves. & Beames,* 193) there was great inadequacy. The purchase was stated by counsel to be at one-tenth of the value. The Master of the Rolls does not, indeed, decide on that point ; but he argues strongly against its sufficiency, as a ground to refuse specific perform-ance. There was, in that case, no pretence of incapacity. The vendor set his own price, and obtained it ; and though he lived a year and a half afterwards, expressed no dissat-isfaction. Yet it was proved that in 1809, when the purchase was made, the estate was worth double the price. The Master of the Rolls, after noticing these facts, remarks, that the Court would treat men's contracts with

great levity, if, on such a state of circumstances, it should refuse to carry them into execution.

In *Griffith* v. *Spratley*, (2 *Br. Ch. Cas.* 179, *n.*) it was decided, that inadequacy alone was not sufficient *to set aside a transaction.*

Having thus noticed most of the cases cited by his honour the Chancellor, I shall proceed to state some of those cited by the counsel.

In *City of London* v. *Richmond*, (2 *Vern.* 423) the bill was filed to compel the performance of a lease.   One objection was, that the rent reserved was £700 *per annum*, and the real value not £300 ; and that it was against the rules of Equity to decree *in specie* such a hard and unreasonable bargain.   But the Lord Keeper *Wright* said, as a beneficial bargain will be decreed in Equity ; so if it happens to be a losing bargain, for the same reason, it ought to be decreed.

*Adams* v. *Weare*, (1 *Br. Ch. Cas.* 567) on appeal from the Rolls, was a bill for the specific performance of an agreement to purchase a mill seat.   The purchaser had agreed to give a large price, in the view of building a mill, which depended on the consent of the corporation of *Bristol.*   The contract was absolute in its terms, and the vendor had refused to annex any condition.   The vendee could not obtain the consent of the corporation, and refused compliance with his contract.   The Master of the Rolls had decreed performance, and Lord Chancellor *Thurlow* said he thought he had done right ; for no case could be cited, where parties have made a bargain with their eyes perfectly open, and no surprise whatever, as in that case, in which the Court had refused to decree a specific performance.   He added, " here is no mistake of the object ; and as to the greatness of the price, *Adams*, (the vendor) had a right to ask a large sum, and the other had agreed to give it, with a view to the intended purpose of erecting and working his mill."

In *Mortimer* v. *Capper*, (1 *Br. Ch. Cas.* 156) the question was, whether Equity would enforce the performance of an agreement, for a piece of land, against the heirs of the vendor, where part of the consideration was an annuity of £50, for the vendor's life, and he had died two days after making

*ALBANY,
April, 1824.*

Seymour
v.
Delancy.

Cases cited by
counsel for appellant.

*City of London* v. *Richmond*, (2 *Vern.* 423)  *A. D.* 1701.

*Adams* v. *Weare*, (1 *Br. Ch. Cas.* 567) *A. D.* 1783.

*Mortimer* v. *Capper*, (1 *Br. Ch. Cas.* 156) *A. D.* 1782.

Seymour
v.
Delancy.

the agreement. The whole consideration was £200, and the annuity £50. The ground was worth £1300; and it was contended that the agreement was too hard, and ought not to be carried into execution. The Lord Chancellor said, " I remember a case of a contract for a piece of ground, which was to be enclosed, for £20, and upon a bill for specific performance, the defence was, that it was worth £200; and although the contract was to be performed *in futuro,* yet, neither party knowing the value, the Master of the Rolls decreed performance." In relation to the case before him, however, he said, " I think, if *the price be fair,* the contract ought not to be cut down merely because the annuity, which is a contingent payment, never became payable;" and he ordered a reference to a Master, to enquire into the real value of the estate and of the annuity.

*Emory* v. *Wase,* (8 *Ves.* 518) *A. D.* 1803.

In *Emery* v. *Wase,* (8 *Ves.* 518) the question was, whether a husband should be compelled to procure his wife to execute his contract; and Lord *Eldon, arguendo,* says, " I do not deny that mere difference in value, though considerable, is not, of itself, a sufficient ground for refusing a specific performance of a contract; but very considerable difference in value is not inconsiderable evidence that it was not made with great care and attention."

*Burrowes* v. *Lock,* (10 *Ves.* 470) *A. D.* 1805.

In *Burrowes* v. *Lock,* (10 *Ves.* 470) *Edward Cartwright* was entitled to £288, and assigned it to the plaintiff, to whom he was indebted £132, and by whom he was pressed for satisfaction of the debt. The costs of the transaction were £10 paid by the plaintiff; and *Cartwright* had previously conveyed away one tenth; so that £142 were given for what was worth £260. The Master of the Rolls decreed performance, saying, " If fraud is out of the case, I do not know that I can set aside this contract, or refuse to act upon it, merely on the ground of inadequacy of price."

*Cadman* v. *Horner,* (18 *Ves.* 10) *A. D.* 1810.

In *Cadman* v. *Horner,* (18 *Ves.* 10) the plaintiff prayed a specific performance of a contract; which was resisted on the ground of inadequacy and misrepresentation; and on those two grounds it was denied. But the Master of the Rolls expressed no opinion upon the question of inadequacy alone.

The case of *Poole* v. *Shergold*, (2 *Br. C. Cas.* 118) decides that the difference arising from the calamities of the times ought not to rescind a contract; and *Jackson* v. *Lever*, (3 *Br. Ch. Cas.* 605) that a contract for the sale of land, for an annuity for the life of the vendor, shall be performed by the vendor's heirs, though he died without receiving any part of it.

The object of the two last cases, I presume, was to shew that, although the navy yard was not established at *Newburgh*, and although *Ellison* died before the application to enforce the contract, yet neither of these circumstances can constitute a defence to the present action.

Many cases have also been cited by the counsel for the respondents, some of which I shall examine. I will first, however, consider a little further some of the above cases.

The case of *Thompson* v. *Harcourt*, I have considered an authority for the appellant. As I before remarked, it was claimed by the counsel on both sides. It was considered by the Chancellor as a case in favour of the respondents. Perhaps, therefore, I am mistaken in my reading of it, but I think not. It was in the House of Lords. The Reporter has not given the opinion of the Judges, and we must infer the ground of decision, from the case, the decree, and the points argued by counsel. The case was decided 13*th Feb.* 1722. On the 9*th November*, in the same year, the case of *Kien* v. *Stukely* was decided, (which I shall hereafter refer to on another point,) in which a specific performance was refused. Both these cases grew out of the *South Sea* speculation, or were connected with it. In the first, where 920 *per cent.* was decreed to be paid, it appeared that when the contract was made, it was fair and equal; that stock, at one time was 1000 *per cent.* above par. The inadequacy arose, therefore, from subsequent circumstances, and did not exist at the time of the contract. In the latter case, lands were sold for 40 years purchase, which, at the time, were worth only 15 years purchase; and the vendee expected to pay in *South Sea* stock. The inadequacy here existed at the time of the contract; and must have been one ground, at

ALBANY,
April, 1824.

Seymour
v.
Delancy.

Some of the above cases further examined.

*Thompson* v. *Harcourt (supra)* an authority for the appellant.

Decided *Feb.* 13, 1722.

*Kien* v. *Stukely (post) Nov.* 9 *A. D.* 1722. Both cases of *South Sea* speculation, &c.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

*London* v.
*Richmond (su-*
*pra.)*

*Adams* v.
*Weare (supra.)*

In the case un-
der considera-
tion, inadequa-
cy existed, at
time of con-
tract.

Cases cited by
counsel for res-
pondents
*Executor of*
*Hill* v. *Nott*, (1
*Vern.* 271-2)
*A. D.* 1684.

*Vaughan* v.
*Thomas*, (1 *Br.*
*Ch. Cas.* 556)
*A. D.* 1783.

least, of the decree. Both cases were decided by the same Court, and within nine months of each other; and, in my opinion, are perfectly reconcileable upon the re ative dif- ference of time at which the inadequacy arose. So in *London* v. *Richmond*, the rent was agreed upon, on a calculation of the quantity of water which certain pipes would dis- charge. This was greatly overrated; yet the Court com- pelled performance. The lessee should have calculated bet- ter; though, I confess, I am not satisfied with that case.

In *Adams* v. *Weare* the seller was explicit. and when the purchaser said he would give the price, *if* the consent of the city of *Bristol* could be obtained, the seller told him, " Sir, I will have no *if* in the case. You must purchase absolute- ly or not at all." In that case, it was admitted, that the in- adequacy existed at the time of the contract, and was known to both parties; and the Court would not permit the pur- chaser, afterwards, to be off from his contract, because he did not succeed in his speculation.

Not so in this case. The appellant avers that the lots were worth the consideration given, or very near it, long be- fore any thing was ever said about a navy yard at *Newburgh;* and on the other hand, the inadequacy is shewn to have ex- isted at the time of the contract, and not to have arisen from subsequent circumstances. It does not appear that the expectation of a navy yard was the sole inducement to the purchase. It is stated, by one witness, that *Ellison* intended to build stores, and sloops, and go extensively into commerce.

*Johnson*, ex'r. of *Hill*, v. *Nott*, (1 *Vern.* 271-2.) In this case, *Hill* bought of the defendant a contingent estate, at an under value. *Nott* had previously brought his bill, to be re- lieved, and was relieved by Lord *Nottingham;* but, upon a rehearing, before Lord Keeper *Guilford*, that decree was re- versed. *Johnson* then brought his bill for a specific perfor- mance; and the Lord Keeper said that a contract which car- ries an equity to have it decreed in specie, ought to be without all objection.

In *Vaughan* v. *Thomas*, (1 *Br. Ch. Cas.* 556) the plaintiff agreed with the defendant for an annuity worth 9 years pur- chase, for the consideration of 5 years purchase, and brought

his bill to compel a specific performance ; but the Court said that if they assisted the plaintiff, they should give sanction to a very unconscientious bargain, and that, under this view of the case, he was by no means entitled to their aid.

In *Collett* v. *Wollaston*, (3 *Br. Ch. Cas.* 228) the plaintiff had purchased, at auction, the reversionary interest of £2000 *South Sea* stock, subject to the life of a man 45 years of age, and £1200 *South Sea* annuities, for £215 ; and filed his bill for an assignment and transfer. The Master of the Rolls said, the reversionary interests seeming to be sold for a very low price, he would direct an inquiry into their value, before he decreed a specific performance of the purchase. (*Vid. also, several cases*, 5 *Vin.* 539 *to* 549, *adhering to the rule in Normanby* v. *Beckley, that the contract must be fair and reasonable in every particular.*)

*Collett* v. *Wollaston*, (3 *Br. Ch. Cas.* 228) *A. D.* 1791.

Several cases in 5 *Vin.* 539 *to* 549, supporting *Marquis f Normanby* v. *Beckley*, (*supra.*)

In *Clitherall* v. *Ogilvie*, (1 *Dess.* 257—63) the defendant entered into a written contract to sell the plaintiff certain lands, for £3500, which were worth three times that amount. On further inquiry as to the value of the property, he declined executing the conveyances ; and the bill was brought for a specific performance. The Court, after a full discussion and examination of the cases on the subject, took notice of the distinction between setting aside an unreasonable contract, after it is executed, and compelling a specific performance ; and, recognizing Lord *Hardwicke's* rule in *Underwood* v. *Hitchcox*, declared, that on full consideration of the case, and all the circumstances, (although there was no proof of fraud or imposition) the sum for which the land was agreed to be sold was grossly inadequate to its real value ; and that, being an unreasonable contract, and a very hard bargain, it would be unreasonable and unjustifiable to decree a specific performance ; and left the plaintiff to his remedy at law.

*Clitherall* v. *Ogilvie*, (1 *Des.* 257) *A. D.* 1792.

In *Ward* v. *Webber*, (1 *Wash. Rep.* 279) President *Pendleton*, delivering the opinion of the Court, says, "It is true that the Court will never decree iniquity ; and there are instances where they have refused to decree hard bargains, though fair ; but these are rare, and are generally cases of glaring hardships. For, in general, the Court will not

*Ward* v. *Webber*, (1 *Wash. Rep.* 279) *A. D.* 1794.

ALBANY,         undertake to estimate the speculations of parties in a con-
April, 1824.    tract, but will deem them the best judges of their own
                views, and will compel a performance, though they may be
Seymour         eventually disappointed in their expectations."
v.
Delaney.

                    In the case of *Campbell* v. *Spencer*, (2 *Bin.* 133) there
Campbell v.     was no fraud or imposition; nor does it appear that there
Spencer,    (2
Bin. 133) A.    was inadequacy to any great degree; but it was a foolish
D. 1800.        bargain, whereby a farmer agreed to sell his farm for the
                remnant of a store of goods; and Chief Justice *Tilghman*
                and Judge *Breckenridge* both say, they would not enforce
                the contract, nor declare it void, but leave the plaintiff to
                his action upon it. Judge *Breckenridge* placed reliance up-
                on its being a hard bargain, attended with suspicious cir-
                cumstances.

Osgood     v.       In the case of *Osgood* v. *Franklin*, (2 *John. Ch. Rep.* 23)
Franklin,    (2
John. Ch. Rep.  the Chancellor remarks, "there is a very important distinc-
23)   A.   D.   tion, which runs through the cases, between ordering a con-
1816.           tract to be rescinded, and decreeing a specific performance.
                Though inadequacy of price is not a ground for decreeing
                an agreement to be delivered up, or a sale rescinded, (unless
                its grossness amount to fraud) yet it may be sufficient for
                the Court to refuse to enforce performance. It is not un-
                common for the Court to refuse to enforce for inadequacy,
                and at the same time to refuse to rescind."

Note to *Clith-*    Chancellor *Dessaussure*, who was not on the bench when
*erall* v. *Ogilvie*, the cause of *Clitherall* v. *Ogilvie* was decided, has added a
(*supra*)    by
chancellor      valuable and learned note to the report of that case, which
*Dessaussure.*  he concludes by observing, "It is agreed, on all hands, that
                the Court is not bound to decree a specific performance in
                every case where it will not set aside the contract, nor bound
                to set aside every contract of which it will not decree the
                specific performance. The Court will not decree specific
                performance, where there is any surprise, making it not fair
                and honest to proceed and call for specific performance."

The question        Having thus taken a cursory view of some of the princi-
is   one   upon
which    great  pal cases on the point under consideration, and having also
men have dif-   noticed the *dicta* of some learned jurists, I shall be justified
fered.
  One    class   in the remark, that the question is one upon which very great
maintain  that  men have differed, and have administered the equity of the
simple inade-

Court upon diametrically opposite principles. The one class maintain, that the Court will not lend its aid to enforce the performance of contracts, unless they are fair, just and reasonable, and founded on adequate consideration. The other class maintain, that unless the inadequacy of price is such as shocks the conscience, and amounts in itself to decisive and conclusive evidence of fraud in the transaction, it is not of itself a sufficient ground for refusing a specific performance.

ALBANY, April, 1824.

Seymour v. Delancy.

quacy is a defence : the other that it must be so gross as to prove fraud. Chancellors, &c. who supported these opposite rules in England.

The most distinguished of those who support the latter doctrine is Lord *Eldon.* To him may be added Sir *William Grant,* Lord Keeper *Wright,* and probably some others. The former doctrine was declared or acted upon by the Lords *Somers, Macclesfield, Northington, Guilford, Talbot, Harcourt, Hardwicke, Alvanley, Erskine, Rosslyn,* and Chief Baron *Eyre,* in *England;* and in this country it has been adopted by the Court of Chancery of *South Carolina,* the Court of Appeals of *Virginia,* and the Court of Chancery of this state ; and I believe there is no American decision to the contrary. Among American jurists, of distinguished celebrity, who have maintained this doctrine, are Chancellor *Dessaussure,* of *South-Carolina,* President *Pendleton,* of *Virginia,* the late Chief Justice *Reeve,* of *Connecticut,* and last, though not least, the late Chancellor *Kent, justum et tenacem propositi virum ;* a man whose stern integrity, superior talents, and extensive erudition, have rendered him an ornament to the Courts over which he has presided in his native state ; and who may, without arrogance, but with the most perfect complacency, look back upon his 26 years of judicial labours, and say—

In this country.

*Exegi monumentum œre perennius ;*
*Regalique situ pyramidum altius :*
*Non omnis moriar ; multaque pars mei*
*Vitabit libitinam.*

If we determine this question by the *prevailing* practice of Courts of Equity, (it has not, indeed, been uniform) we must decide in favour of the rule as laid down by Lord *Hardwicke.* If we determine it by the reason and propriety of the two propositions, there is certainly great weight in the consideration that, in enforcing contracts, the Court, if it

The weight of authority is in favour of the first ; and so if it be considered upon principle.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

acts at all, must act *ex rigore*, and cannot weigh the equities of the parties; whereas a jury, in a Court of law, can mitigate the damages according to equity and good conscience. It seems, indeed, paradoxical, to send parties from a Court of Equity to a Court of law, to obtain equity; but it arises from the peculiar construction and practice of the Courts.

Again, if we call to our aid the opinions of men among the most celebrated for their learning and talents, of the times in which they respectively lived, we find a great preponderance in favour of sending hard and inequitable bargains to a Court of law.

Equity should should not decree performance, unless contract be fair, just, reasonable and equal.

Upon authority therefore, as well as upon principle, I am clearly of opinion, that a Court of Equity ought not to lend its aid in enforcing an executory contract unless it is fair, just, reasonable and equal in all its parts, and founded upon adequate consideration.

It is well settled that inadequacy alone is not ground to set aside contract. There is a wide difference between enforcing and setting aside.

It is undoubtedly well settled that inadequacy of price, alone, is not a sufficient reason for setting aside a contract executed, unless its grossness amount to fraud; but there is a wide difference between enforcing an executory contract, and setting aside a contract deliberately executed; and the two subjects admit of very different views and considerations.

2d point; Debility from intoxication. Evidence.

The next ground of defence is, that *Ellison's* mind was debilitated by habitual intoxication. The witnesses agree as to the fact of his habitual intemperance, for some years before his death; but they differ in their opinions as to the effect produced by it upon his capacity to transact business. The fact is before the Court; and our acquaintance with mankind supersedes the necessity of evidence to prove that habitual inebriety, in most cases, debilitates the mind. As like causes produce like effects, it would require strong proof to shew that *Ellison* was an exception to the general rule. It also appears that this contract was unknown to his family and friends. It was made by *Drake Seymour*, on behalf of his brother. And though the character of *Drake Seymour* rebuts the idea of fraud or imposition upon a man under intoxication; yet it is well known that interest has a controll-

ing influence over the minds of many, perhaps of most men, even of correct principles; and may, and often does, induce them to make bargains which conscience cannot approve.

The third ground of defence is, that the appellant was unable on the day appointed, to give a title to the lots, on account of incumbrances.

The appellant's counsel contend, that it is sufficient, if he was able to give a title at the time of the decree; and so it was decided by the Master of the Rolls, in *Langford* v. *Pitt*, (2 *P. Wms.* 630.) He said that the direction of the Court, in all cases, was, to enquire whether the seller *can*, not whether he *could* make a title at the time of executing the agreement.  In *Wynn* v. *Morgan*, (7 *Ves.* 202) it was decided that where the time, at which the contract was to be executed, is not material, and there is no unreasonable delay, the vendor, though not having a good title at the time the contract was to be executed nor when the bill was filed, but being able to make a title at the hearing, is entitled to a specific performance.

Cases on 3d point.

Langford v.
Pitt,    (2  P.
Wms  630.) A.
D. 1731.

Wynn    v.
Morgan,    (7
Ves. 202.)  A.
D. 1802.

In *Brashier* v. *Gratz*, (6 *Wheat.* 528) Chief Justice *Marshall* says, the rule, that time is not of the essence of a contract, has been recognized in Courts of Equity; that a failure to perform on the day does not deprive a purchaser of his right to demand a specific performance at a subsequent day, when he shall be able to comply with his part of the engagement. But the rule is not universal. Circumstances may have changed; and the other party may be placed in a worse condition; and then the Court would leave the parties to their remedy at law. The party who is ready, may file his bill requiring the other to perform or rescind; and the Court will compel him to do one or the other. If, then, a bill for a specific performance be brought by a party who is himself in fault, the Court will consider all the circumstances of the case, and decree according to those circumstances.

In *Hepburn* v. *Auld*, (5 *Cranch* 262) the same point had been so ruled; though Mr. Justice *Livingston* expressed his dissent, on the point of dispensing with time. (1 *Wheat.* 195-6, *S. C.*)

Seymour
v.
Delancy.

In *Butler* v. *O'Hear*, (1 *Dess*. 398) the Court say, lapse of time, unattended with other circumstances, is not, of itself, a sufficient ground for it to refuse its aid to compel a specific performance of an agreement; that it was sufficient if the plaintiff could *then* make title.

*Judson* v. *Wass*, (11 *John.* 525,) *A. D.* 1814.

In *Judson* v. *Wass*, (11 *John. Rep.* 525) which was a case of the sale of land, at auction, one of the conditions being that the money should be paid in 75 hours, the conveyance to be dated on the day of sale; the premises were encumbered with a mortgage; and the Court said that in every sale of that kind, there is a condition, that the purchaser shall not be bound to part with his money, unless the seller is able to give him a title according to the terms of the sale. That, however, was an action at law, and is not applicable here.

*Waters* v. *Travis*, (9 *John.* 466,) *A. D.* 1812.

In *Waters* v. *Travis*, (9 *John. Rep.* 466) the late Chief Justice *Spencer*, who gave the opinion of this Court, says, the lapse of time, when no material inconvenience has been suffered, can be urged only on the ground that it is evidence of abandonment of the agreement.

Incapacity to give title June 1st, 1820, not, *per se*, an objection.

In the case now under consideration, I am inclined to the opinion, that the appellant not being in a condition to give a good title on the 1st of *June*, 1820, is, of itself, no objection to a specific performance. The conveyances were to be simultaneous acts; or rather, by the terms of the contract, *Ellison* was first to convey. The language of *Seymour's* covenant is, " In consideration of which premises (the conveyance by *Ellison*) the said *William Seymour* doth by these presents covenant and agree, &c."

Otherwise when connected with inadequacy of consideration.

But it seems, that when there is great inadequacy of consideration, the vendor is held to great strictness, as to time, in the performance on his part. In the case of *Kien* v.

*Kien* v. *Stukely*, (2 *Br. P. C.* 396-8,) *A. D.* 1722.

*Stukely*, (2 *Br. P. C.* 396-8,) *Stukely*, on the 20th *July*, 1720, sold lands by contract to *Kien* for 40 years purchase, when they were worth only 15 years purchase, and £120 were paid; *Kien* intending to pay the residue in *South Sea* stock, which was then worth 1000 *per cent.*; and the title was to be made out on the 29th *Dec.* then next. The title was not made out by the day, and *Kien* declined the purchase. On a bill filed by *Stukely*, performance was decreed;

but on appeal to the House of Lords, this decree was reversed. By the report in *Brown*, the decree seems to rests on the ground of inadequacy ; and the point relating to time is not stated ; but from a report of the same case by Baron *Gilbert*, (*Gilb. Rep.* 155-6) it seems to have been decided on the ground of the vendor not having made out his title to the premises sold by the day stipulated in the contract. The decision is understood by *Sugden* in his treatise on vendors, *p.* 281, as having been made upon both grounds, and he has deduced from it this principle ; that when the price is unreasonable or inadequate, or the contract is in other respects inequitable, Equity will not assist either party, if he has permitted the day appointed for completing the contract to elapse without performing his part of the agreement.

On the whole case, therefore, I am of opinion :

1. That on the question of decreeing specific performance of executory contracts, the Court of Chancery must exercise its discretion ; not an arbitrary, but a sound judicial discretion. If the contract be free from objection, it is the duty of the Court to decree performance. But if there are circumstances of unfairness, though not amounting to fraud or oppression, or if the inadequacy of consideration be so great as to render the bargain hard and unconscionable ; on either ground the Court may refuse its aid to enforce the contract, and leave the parties to contest their rights in a Court of law.

If it is asked what degree of inadequacy is necessary to constitute the bargain a hard one ; it might be asked, in answer, what degree of inadequacy is necessary to constitute fraud—to shock the conscience, and produce an exclamation ?

The truth is, that neither the one nor the other admits of a definite answer. It must be determined by the judgment of the Court ; and as there is certainly a difficulty in ascertaining the precise point, there is much less danger in stopping short of it, than in going beyond it. To me it seems a solecism in language, to say that a party, who has obtained

Vol. III. 67

ALBANY, April, 1824.

Seymour v. Delancy.

*Gilb. Rep.* 155-6, *S. C.*

*Sugden's L. V.* 281, *S. C.*

Recapitulation.
1. On question of decreeing performing chancery must exercise a sound judicial discretion. If contract be free from objection, performance should be decreed. But if unfairness, not amounting to fraud or oppression, or such inadequacy as to render bargain hard and unconscionable ; on either ground, court may leave parties to law.

Seymour
v.
Delancey.

Evidence of
incapacity
from intoxica-
tion; though
not full, is e-
nough to raise
doubt.

an *inequitable* bargain, shall be received, in a Court of *Equity*, to demand its performance.

2. In the next place, though the incompetency of *Ellison* arising from habitual intemperance, is not clearly established; yet enough appears to raise a doubt on the subject, and to cast a suspicion upon the fairness of the transaction. The authorities cited, on the question of *setting aside* contracts obtained from persons while under the influence of intoxication, are not applicable. None of them state that a contract so obtained ought to be *enforced* in Equity, by decreeing a specific execution.

Lapse of time
connected with
inadequacy,
justifies court
in refusing
performance.

3. And, although, lapse of time when not of the essence of a contract, or an incapacity to make title on the day stipulated, are not insuperable obstacles in the way of obtaining the specific execution of a contract, provided title can be made before the decree; yet, when connected with inadequacy of price, they will justify the Court in withholding the exercise of its extraordinary powers in compelling a specific performance.

Decree should,
therefore, be
affirmed.

I concur, therefore, with his honour the Chancellor, and am of opinion that his decree should be affirmed.

Woodworth, J. not having heard the argument, gave no opinion.

Clark, Earll, Gardiner, Green, Mallory, M'Call, Morgan, Ward and Wright, Senators, concurred in the opinion of the Chief Justice.

Sudam, Senator. In this case, it cannot be necessary for me to enter into a detailed statement of the facts. I shall merely take a general view of the claims of the appellant, and of the defence set up by the respondents, and then proceed to the consideration of the questions submitted to the Court by the counsel who have so ably and ingeniously argued this cause.

Statement of
the case.

Agreement.

*William Seymour*, the appellant, and *Thomas Ellison*, the father of the respondents, on the 14th of *January*, 1820, entered into an agreement for the exchange of one third of certain lots owned by *Seymour*, in the village of *Newburgh*,

for certain farms, owned by *Ellison*, in *Montgomery* and *Wal-kill*. The property is particularly described in the article between them. By this agreement, *Ellison* covenanted with *Seymour*, that he would on or before the 1*st* day of *June* next ensuing its date, by sufficient conveyances, grant, bargain and sell, &c. the farms to the appellant, in fee simple ; in consideration of which, *Seymour* covenanted and agreed, that he would, on or before the 1*st* day of *June* ensuing the date, sufficiently grant, bargain and sell to *Ellison*, the equal undivided third parts of the *Newburgh* lots, with the wharves, buildings, &c. The articles of agreement contain the following clause : " And it is hereby further agreed by and between the said parties, that it shall be lawful for them respectively to enter into and upon the said premises to them respectively intended to be granted and conveyed, and to have and receive the profits thereof to their own use respectively."

The bill states that, in pursuance of this agreement, *Seymour* entered into possession of, and received the rents and profits of the property to be conveyed to him by *Ellison*, and *Ellison* entered into the possession of the property to be conveyed to him by *Seymour* ; and that *Ellison's* heirs at law have, since his death, continued in possession ; that *Seymour*, during the life time of *Ellison*, was always ready to convey to him, according to his contract, but that *Ellison*, for several months previous to his death, was incapable of transacting business ; and that he died about the 3*d* of *August*, 1820, intestate, leaving *Harriet Ellison*, his widow, and the respondents, his heirs at law ; that all his children, except *Mary Jane De Lancy*, are infants, under the age of 21 years ; and that, by reason of their infancy, they cannot convey, according to the terms of the contract ; that Mrs. *Ellison*, (the widow of *Thomas Ellison*) died before the time of filing the bill.

The prayer of the appellant is, that the respondents may be decreed to execute a deed, according to the true intent and meaning of the covenant entered into between the appellant and *Thomas Ellison*, in his life time.

The respondents admit, 1. That their father, *Thomas Ellison*, entered into the covenant with *Seymour*, the appel-

Parties to take possession.

What the bill states.

Prayer of the bill.

Answer.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

lant ; but they leave him to prove whether he had a sufficient title to the property to be conveyed by him : 2. They insist, that he had previously conveyed a portion of it to his sister, *Esther Seymour*, or to some other person, for her use or benefit : 3. That his title was very questionable : 4. That the bargain for the exchange was unconscionable, inasmuch as the lands to be conveyed by *Ellison* to *Seymour* exceeded the value of the lands to be conveyed by *Seymour* to *Ellison*, by several thousand dollars : 5. That the appellant could not make a good title to the premises, because they were encumbered by a mortgage remaining uncancelled at the death of *Ellison* : 6. That the appellant did not, on or before, or subsequent to the day specified, tender a deed, in pursuance of the article : 7. That *Ellison*, from the 14*th January*, 1820, until the 1*st June*, 1820, " was, in all respects, as capable and competent to transact business, as he was for several weeks and months previous to the 14*th* of *January*, 1820." Then the respondents, after stating their age, and denying that the appellant was ready and willing to execute and deliver a deed to *Ellison* in his life time, and leaving him to his proof, submit themselves to the decree of the Court.

Decree.

In the decree entered in this cause, by his honour the Chancellor, he refuses to direct a specific performance of the contract by the heirs at law of *Ellison*, " from the great inadequacy in value of the lots in the village of *Newburgh*, which *Seymour* contracted to convey to *Ellison*, for the two farms in *Orange* county, which *Ellison* contracted to convey to *Seymour*, as mentioned in the pleadings and proofs ; and, also, from the habits of intoxication in which *Ellison* had indulged in the last years of his life, and the mental debility produced thereby ; and, also, from the want of readiness and ability in *Seymour* to convey a good and unencumbered title to the said lots in the village of *Newburgh*, at the time fixed for the performance of said contract, or at any time thereafter, during the life time of *Ellison*."

Points taken
by respondents
in its support.

The respondents, in support of this decree, make the following points :

1. That the bargain was *hard, disproportionate* and *unequal in its terms.*

2. That during the time of the negotiation, and at the time *Ellison* entered into the contract, he was not in a fit state of mind to form such an agreement, or to understand his rights or appreciate his interests ; and that the bargain was *secretly* and *unfairly* obtained by the appellant.

3. That the appellant did not, and could not perform the agreement on his part as stipulated by him, in the life time of *Ellison,* because the appellant's lands were incumbered to their value; and there was no waiver of time, or indulgence given, by *Ellison* in his life time, nor by the respondents since his decease.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

The first point made by the respondents, that this contract for exchange of lands was *hard, disproportionate and unequal in its terms,* is the main point in the cause, and has been so treated by the Chancellor in his opinion. He assumes it as a fact, that " at the date of the agreement, the village lots were not worth half the value of the country farms ;" and says, " we may make an ample advance of the one, and an ample diminution of the other, in value, if we were to fix the *one third* of the *Newburgh* lots at $6,000, and the farms at $12,000."

The decision, upon the evidence given as to the difference in value between the property to be conveyed by the appellant to the father of the respondents, may decide the cause, without entering into the consideration of the other points ; but I think our decision must depend mainly on other evidence ; for it cannot be sustained, in my opinion, that *mere inequality* in value, which is not so gross as to strike the moral feeling of an indifferent man, would be sufficient to warrant the Chancellor in withholding a decree for specific performance. I admit that the exercise of the power, in a Court of Chancery, to enforce the specific performance of contracts for the sale or the exchange of land, rests in the sound discretion of the Court ; but this is a sound legal discretion ; and not the exercise of an arbitrary power, interfering with the contracts of individuals, and sporting with their vested rights. I also admit, that the party claiming the spe-

*1st point—contract hard disproportionate, and unequal—considered.*

*Inadequacy of at least 1-2 was assumed by the chancellor.*

*Mere inequality in value, not so gross as to strike the moral feeling of an indifferent man, is not a sufficient defence to a bill for specific performance. The decreeing performance rests in the sound discretion of the court of chancery, but this*

ALBANY.
April, 1824.

Seymour
v.
Delancy.

is a sound legal
discretion.
    The party
claiming per-
formance must
present a case
fair, just, and
reasonable.
    The contract
must be for ad-
equate consid-
eration ;
    And must be
free    from
fraud, misrep-
resentation,
deceit, or sur-
prise.
    Evidence as
to these heads.

cific performance must present a case *fair, just* and *reason-able ;* that the contract must be founded on *adequate consid-eration ;* and that it must be free from *fraud, misrepresenta-tion, deceit,* or *surprise.*

To determine whether, in fact, the agreement for exchange was hard, unequal, and disproportionate, and whether it was free from *fraud, surprise,* &c. it will be necessary to exam-ine, with as much brevity as possible, the history of this transaction.

On the 3d of *January,* 1818, *Drake Seymour,* the brother of the appellant, sold to *Ellison,* the father of the respon-dents, the one equal undivided third part of the lot first des-cribed in the articles of agreement, lying on the east side of *Water-street,* for the sum of $12,500, cash. This bargain was made verbally, in the year 1817, and completed, by the delivery of the deed, in *January,* 1818 ; and the negotiation concerning it was kept up from *April,* 1817, to *January,* 1818, when it was consummated. In *March,* 1818, *Ellison* agreed to purchase of *Samuel Sands Seymour,* his undivided third part in the same lots, lying east and west of *Water-street,* for $13,825, he taking, in part payment, a mortgage which *Ellison* held against one *Tallman,* and *Ellison* agree-ing to guaranty, that, on foreclosure, the mortgaged premises should produce the principal and interest due. This con-tract was signed and sealed by the parties.

In *March,* 1818, *Ellison* informed *Drake Seymour,* "that he had only to purchase the part of the lot belonging to the appellant, to own the whole," and made propositions to the witness, (*Drake Seymour*) to be submitted to his brother. Both in the years 1818 and 1819, *Drake Seymour* frequently saw *Ellison* in relation to the purchase of the appellant's one-third of the lots ; and from the time *Ellison* first propo-sed to purchase from the appellant, to the time when a *verbal contract* was concluded for the exchange, more than 18 months had elapsed; and about 1 year and 10 months had elapsed before it was reduced to writing and signed by *El-lison* and the appellant. On the conclusion of the verbal agreement, *Ellison* authorized the appellant to take possess-ion of the farms, and possession was taken accordingly. In

*January*, 1820, the appellant sent by *Drake Seymour*, to *Ellison*, at *New-York*, the articles of agreement in question, already executed on his part. They were handed to *Ellison*, to be executed by him. He requested that they might be left with him for examination, to see if they were in conformity with the verbal agreement. He examined them, found them correct, and executed them the day after.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

By the evidence of *Samuel M'Coun*, who was employed by *Ellison* to estimate the value of the farms, it distinctly appears, that he understood from *Ellison*, that he and the appellant were negotiating for the exchange. In various conversations, he told *M'Coun* "that he was negotiating an exchange with the appellant, and that he wished *M'Coun* to make up his mind upon the value of the two farms, (to be exchanged for the *Newburgh* lots.) That he, (*Ellison*) did not wish *M'Coun* to appraise the appellant's lots in the village of *Newburgh* ; but that he would do that himself." It is also in evidence that *Ellison*, during the summer, resided in *New-Windsor*, in the county of *Orange*, adjoining the village of *Newburgh*, and that he was well acquainted with the property of the appellant, proposed to be exchanged for his two farms. It also appears that *Ellison* had a favourable opinion of *Newburgh*, as a business place ; and he may have been influenced by the consideration, that property there would rise in value, in consequence of the expected establishment of a navy yard.

That the contract was deliberately made, there can be doubt. *M'Coun* says, expressly, that *Ellison* told him "he would not conclude the bargain between him and the appellant, until he had seen him," (*M'Coun*,) and ascertained his opinion of the value of the farms.

Contract made deliberately.

We here find a purchase by *Ellison* in *January*, 1818, of one third of the *Newburgh* lots east of *Water-street*, for the sum of $12,500, on a negotiation commenced in *April* preceding, and at a time when, according to the pleadings and proofs, there is no pretence of incompetency. About *March*, 1818, *Ellison* purchased from *S. S. Seymour*, his undivided third in the *Newburgh* lots, lying east and west of *Water-street*, for the sum of $13,825. About the same time, he

informed *Drake Seymour*, that he had purchased one third of *S. S. Seymour*, and talked of exchanging the farms for the like share of the appellant. In addition, he informed *Benjamin Case* and *John Anderson*, that he had purchased the shares of *Drake* & *S. S. Seymour;* and that he also intended to purchase the share of the appellant; and he told *Anderson* how he intended to render the property valuable to himself.

The whole presents a very strong case, and one in which the contract should be carried into effect, unless some controlling rule of decision in our Equity Courts shall require the contrary.

*Ellison* knew all the facts.

There can be no doubt, from a review of the evidence, that *Ellison* made his bargain, well knowing all the facts, in relation to the *Newburgh lots*, as well as his farms proposed to be exchanged for them. His own agent (*M'Coun*) ascertained the value of the farms. He said he would himself *appraise the value of the lots in Newburgh.* It could not be pretended, that after a purchase of two thirds of the whole property, he had never examined the premises, or that he had not ascertained the situation and comparative value of the *Newburgh* lots ; for it is admitted by all parties, that at the time of his purchase from *Drake Seymour*, and his agreeing to purchase of *S. S. Seymour*, he was not incompetent to transact business of any kind. Immediately after this, the negotiation for the one third of the appellant's lots commenced, and that negotiation continued for 18 months before it was verbally concluded ; and for one year and ten months

Was well acquainted with the premises, and competent to transact business:

before it was reduced to writing. There is, therefore, no pretence, in my opinion, that *Ellison* was not fully acquainted with the premises, proposed to be exchanged with him, by the appellant. Besides having before become the purchaser of two thirds of the lot on the east side of *Water-street*, and the one third of the lot of *S. S. Seymour* on the west side of the same street, and having paid, in each instance, a sum exceeding the price he had agreed to pay the appellant, we have the positive testimony of *Drake Seymour* that throughout the whole of the negotiation he was perfectly competent to transact business. He was in a sit-

uation deliberately to form his opinion, and unquestionably he did do so, as to the value of the *Newburgh* lots ; and from his previous purchases, he must have ascertained their value, to his own satisfaction. Under the advice of his agent, he knew the value of the property to be conveyed by him to the appellant. We must take it, then, that *Ellison*, deliberately, and with his eyes open, entered into the contract which the appellant now seeks to enforce by a decree of a Court of Equity.

I am, therefore, of opinion, from a review of the whole evidence, that this contract was, at the time the negotiation was first entered into, and at the time the articles were executed by *Seymour* and *Ellison, certain, fair and just*, in all its parts.

The next question which presents itself to the consideration of the Court is, whether the contract between the appellant and *Ellison* is so *hard, unreasonable, or unequal*, that this Court will not aid to enforce it.

In reviewing this part of the case, it will be the duty of the Court to investigate the evidence as to the value of the *Newburgh* lots, and the farms to be exchanged for them. Should they arrive at the conclusion that *mere inadequacy* in value, where there is *no fraud, misrepresentation, imposition, or concealment of facts, is of itself sufficient to avoid the contract*, it will save a great deal of the labour and investigation which might otherwise be required. I admit, however, that where the inadequacy of price in a contract is so flagrant and palpable as to convince a man at the first blush, that one of the contracting parties had been imposed on by some false pretence, such a contract ought not to be enforced by this, or any other Court of Equity. It is not to be denied, that it is the settled doctrine of the Court of Chancery, that it will not carry into effect, specifically, a contract where the inadequacy of price amounts to conclusive evidence of fraud. In this view of the case, therefore, as well as in reference to the objection of mere inadequacy, I shall briefly examine the evidence of value.

*Margin notes:*
ALBANY, April, 1824.

Seymour v. Delancy.

Contract certain, fair and just, in all its parts.

Whether it was hard, unconscionable, or unequal.

Where inadequacy of price is so great as to evince fraud, the contract should not be enforced.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

There is a distinction between a court of chancery refusing to decree performance of an agreement, and setting it aside. So they will not disturb an agreement that has been executed, though they would not have decreed its performance.

In the first case they leave the party to his remedy at law: in the second, refuse to order the agreement to be cancelled.

For fraud, circumvention, deceit, or misrepresentation, they would order it delivered up to be cancelled.

Whether equity should avoid the contract between S. and E.

Not to carry it into effect would be to avoid it.

If to warrant this the inadequacy should be such as to evince fraud, chancellor's opinion cannot be supported.

It may be proper to premise, that there is a distinction between a Court of Chancery, refusing to decree the specific performance of a contract, and setting it aside. (*Mortlock* v. *Buller*, 10 *Ves.* 292.) It is also well settled, that a Court of Equity will not disturb an agreement that *has been executed*, although they would not have decreed a specific performance. (*Willan* v. *Willan*, 16 *Ves.* 83.) In the first case, the Court would leave the party to his remedy at law. In the second, they would refuse to interfere by directing the agreement to be cancelled, the party having consummated his own act. But if there should be fraud, circumvention, deceit, or misrepresentation, a Court of Chancery would order the contract to be delivered up to be cancelled. This case, then, being free from fraud, concealment and misrepresentation, and from the charge of a hasty and unadvised contract, one important question appears to be, can a Court of Equity interfere, under such circumstances, to avoid the contract? For, in my opinion, not to carry this contract into effect is to avoid it wholly. It would be well to consider whether this is a case coming within the rule. For if it be true that the respondents must rest the decree of the Chancellor, principally, on the inadequacy in value of the property to be exchanged; and if it be true that, in order to avoid such a contract, the inadequacy of price must amount to conclusive evidence of fraud, (*Western* v. *Russell*, 3 *Ves.* & *Bea.* 187 ; *Willan* v. *Willan*, 16 *Ves.* 83 ; *Coles* v. *Trecothick*, 9 *Ves.* 246, *per Ld. Eldon*) I do not see in what manner the opinion of his Honor the Chancellor can be supported.

There is no question so well calculated to generate a variety of opinion, as that which regards the value of a village lot, or a farm in the country ; and unless the disproportion should be gross and palpable, it would be very difficult to estimate how much more had been given by *A.* for a lot than the price at which *B.* would value it.

This, by the proofs, is the precise case before us. The average value of the appellant's interest in the lots at *Newburgh*, as sworn to by six witnesses, is $10,856 ; and this is corroborated by the fact, that the father of the appellant es-

timated the lot east of *Water-street*, several years since, at $30,000. The average of the farms, as sworn to by witnesses, is $12,686, and the difference about $2,186, according to the highest estimate made by the witnesses of the respondents. The lowest estimate of the *Newburgh* lots, by the respondents' witnesses, is between 5 and 6000 dollars. That a difference of opinion should exist among the witnesses, both as to the value of the lots in *Newburgh* and the farms of *Ellison*, is very natural. Every person, at all acquainted with the price set upon real property, and that which is paid when sales do take place in the country, and in country villages, must be aware to what extent an honest difference of opinion does and always will exist. One will venture his fortune in the purchase of property which, in his judgment, will lay the foundation for a comfortable settlement of his family, while his immediate neighbour, with the same knowledge of all the circumstances, pronounces the purchase rash and injudicious. There is scarcely an instance in which a great difference of opinion does not exist, upon the point, whether the purchaser has a good bargain or not. In the country, and in country villages, there is no settled criterion by which property can be estimated. It is not an uncommon circumstance for men to hold on upon real estate, in the hope of getting their price, until the law interferes, and the Sheriff is compelled to solve all scruples on the subject. In the present case, *Ellison*, a man of fortune, and competent to carry into effect his plans for the improvement of the two *Newburgh* lots, impressed with the idea of the growing importance of that village, and influenced, in all probability, by the expectation of the establishment of a navy yard in its vicinity, and being the owner of two thirds of the premises in question, exchanges certain farms in the country for the lots in *Newburgh*. He does this deliberately, freely, and with a full knowledge of the situation of his own property and that which he agreed to take in exchange. There is no ground for saying that there was, in this case, either fraud, surprise, misrepresentation, or deceit. The bargain was conducted by him throughout with great deliberation, and he consummated it with his eyes open. Under such circum-

ALBANY,
April, 1824.

Seymour
v.
Delancy.

Evidence as to value of the property agreed to be exchanged.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

Inadequacy of price, unless it amount to conclusive evidence of fraud, is not itself a sufficient ground for refusing a specific performance of an agreement.

The cases upon this point considered.

stances, we are called on to say, that mere inadequacy of price, and where there is much contradictory evidence, is of itself sufficient to prevent the Court of Chancery from decreeing the specific performance of the contract.

In the case of *Coles* v. *Trecothick*, (9 *Ves.* 246) Lord *Eldon* observed, that inadequacy of price, unless it amounted to *conclusive evidence* of fraud, was not itself a sufficient ground for refusing a specific performance ; and, although this was the case of an auction sale, the opinion was pronounced on the general question. In *Mortlock* v. *Buller*, (.0 *Ves.* 292) the Lord Chancellor declined giving an opinion on the doctrine of inadequacy. In *Western* v. *Russell*, (3 *Ves. & Bea.* 187) the defence was *gross inadequacy of consideration.* The Master of the Rolls said that it was not necessary to determine the general question whether inadequacy of price might not be a ground for refusing performance, and he decided the case upon its special circumstances, and held that, as the vendor was not alleged to be under any incapacity or deficiency of judgment, and *set his own price and obtained it,* and never expressed any dissatisfaction, but accused the purchaser of delay, the agreement should be carried into execution. Chancellor *Kent* admits, that Lord *Eldon* and the Master of the Rolls had thrown doubt and distrust on this doctrine that inadequacy of price is of itself sufficient to prevent a specific execution.

In *Collier* v. *Brown;* (1 *Cox*, 428) it was expressly held, on a bill for specific performance, that if the parties bargained with their *eyes open,* and without *imposition* or *surprise,* mere inadequacy of price was not of itself sufficient to prevent the Court from administering its usual equity. This is the doctrine of common sense and common honesty ; for it may be asked, with great propriety, what right have we to sport with the contracts of parties fairly and deliberately entered into, and prevent them from being carried into effect ?

I cannot assent to the doctrine, that inadequacy of price may, of itself and without fraud or other ingredient, be sufficient to stay the application of the power of a Court of

Chancery, to enforce a specific performance of a private contract to sell land.

To establish this doctrine in the state of *New-York*, would, to my mind, be sanctioning a principle, which would lead to very injurious results. Every member of this Court must be well aware how much property is held by contract; that purchases are constantly made upon speculation ; that the value of real estate is fluctuating ; and that there, most generally, exists an honest difference of opinion in regard to any bargain, as to its being a beneficial one, or not.  To say, when all is fair, and the parties deal on equal terms, that a Court of Equity will not interfere, does not appear to me to be supported by authority ; (*Day* v. *Newman*, 2 *Cox*, 77 ; *Willan* v. *Willan*, 16 *Ves.* 83 ; *Western* v. *Russel*, 3 *Ves. & Bea.* 187 ; *Mortlock* v. *Buller*, 10 *Ves.* 292,) and unless I am bound down by some rigid rule of law, I, for one, cannot consent to its introduction into our equity code.

I have not had time to analyze all the cases which have been cited, so as to bring them in review before the Court. The earlier cases are very loosely reported ; and we cannot, either from the decisions made, or from the opinions of the Court, form a satisfactory judgment on the particular facts ; and from the doubts and disapprobation of Sir *William Grant*, the Master of the Rolls, and of Lord *Eldon*, I feel myself warranted in saying that the point is unsettled in *England*.  Nor can I perceive why a contract for the sale of land, which is fair in all its parts, should not be carried into effect, as much as any other contract. In principle there is not, and there ought not to be a difference.

There may be such inadequacy of price as, of itself, to be an evidence of fraud.  But wherever this does not exist, and resort is had to the testimony of witnesses, and they differ in their valuation, as in the present case, the contract should be executed.  In the case before the Court, the average value of the farms, by six of the *respondents'* witnesses, is $12,686.  Six witnesses on the part of the appellant, (and men, too, of great respectability,) value the *Newburgh* lots at $10,856.  The difference is $1830.  How is it possible for any Chancellor to decide upon the relative weight of

*Margin notes:*

ALBANY, April, 1824.

Seymour v. Delancy.

Injurious results in this state arising from a contrary principle. It does not appear to be supported by authority.

Earlier cases loosely reported.

Point unsettled in *England*.

There may be such great inadequacy as to evince fraud. If otherwise ; and witnesses differ as in this case, the contract should be executed.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

such evidence ? What can clearly be extracted from such a state of the case is, that it is much better to carry the contract into effect, than that the rule of equity should depend on the judgment of a single individual. It is impossible for any Court to appreciate all the considerations which influ ence men who enter into speculations of this kind. I admit that the case might present a different aspect, if all the wit- nesses agreed in opinion. But here is a difference of opin- ion among some of the most respectable people in *New- burgh*, as to the value of the lots ; and the witnesses fo: the appellant are supported by the former purchases made by *Ellison* when he was as sane as he ever was.

This is stron- ger for the ap- pellant than if it had been a mere cash sale.

There is another circumstance which has considerable weight with me ; and it is that this contract is for the *ex- change* of real property. It cannot be denied, that. in such cases, each party is anxious to put a high nominal value on his own land. It is a transaction wholly different, in this respect, from that of a cash sale. Although the *Newburgh* lots did not produce an income proportionate to the value put upon them by the appellant, yet the same objection ex- isted as to the farms ; for it appears by the evidence of *Colden*, that they were very much out of repair.

Not such in- adequacy as to be conclusive evidence of fraud ; and contract being entered into deliberately, and being fair in all its parts, should be exe- cuted.

Upon the whole, I am of opinion, that there is not in the present case such an inadequacy of price, as, of itself, amounts to conclusive evidence of fraud ; that the contract between the appellant and *Ellison*, in his life time, was enter- ed into with a full knowledge of all the circumstances by *Ellison*, and after much deliberation ; and that it is fair in all its parts ; and that the respondents ought to be compelled specifically to carry it into effect. (*Coles* v. *Trecothick*, 9 *Ves*. 246.)

2d point of de- fence, weight of testimony as to incompe- tency, clearly in favor of ap- pellants.

I have not entered at large into the consideration of the question raised on the argument, as to the incompetency of *Ellison* ; because it appeared to me that the weight of tes- timony, on that point, was clearly with the appellant ; and all the facts in the case show that he concluded the bargain with great care and deliberation. If *Drake Seymour* is to be believed, (and I think he is entitled to the most implicit credit) *Ellison* was perfectly competent to transact business

throughout the whole negotiation, and when he was not so, the subject was never mentioned to him. Indeed, his own agent, *M'Coun*, says that when intoxicated, he never knew him attempt to do business. Where a general incapacity is proved, it is the duty of the adverse party to shew competency when the contract was executed; but in the present case all the evidence goes to shew *Ellison's* competency to transact business when the negotiation commenced; and *Drake Seymour* expressly swears to it when the contract was executed.

As to the third point, that the appellant was not in a situation to give a good title to the village lots, either when he contracted, or when the deeds were to be exchanged, I am somewhat at a loss to reconcile the decree of his honor the late Chancellor, with itself. He says, on this point, "that the appellant was in default on the 1st of *June*, 1820. He ought to have shown himself able and ready to convey on that day;" and that he was in default because the property was encumbered by a mortgage of $5000.

In conclusion, however, he says that he heard no evidence as to the complainant's title; that in the case of a specific performance, it is the usual course of the Court, to refer the inquiry as to title to a Master. In my judgment, this inquiry extends not only to the actual title, but to incumbrances upon the property. In fact, the Master is to inquire whether the party can make a deed, according to his contract. If he can, it is sufficient, although he was not in a situation to do so when he entered into the contract, or at the time for performance; though it might be otherwise, where one party had been quickened by the other, or where time is of the essence of the contract, as where it relates to stocks or other personal chattels. (2 *Pow. on Contr.* 266, 267. 3 *Eq. Abr.* 690. 2 *P. Wms.* 630, 631. 7 *Ves.* 202. 10 *Ves.* 315. 6 *Ves.* 646. 2 *Cox*, 77. 2 *John. Rep.* 595, 614.)

The appellant's remedy is lost at law, because the property was covered by a mortgage. But *that* is no objection in a Court of Equity. (*Newl. on Contr.* 89.) It is the peculiar privilege of Courts of Equity to interfere where the

---

ALBANY,
April, 1824.

Seymour
v.
Delancy.

3d point.
Whether appellant could give a good title.

It is sufficient if the vendor can make a good title at the time of the decree, unless he has been quickened by the vendee, or time be of the essence of the contract, as where it relates to stocks, or personal chattels.

ALBANY,
April, 1824.

Seymour
v.
Delancy.

remedy is defective at law, if it be not against conscience ; and *if a contract be fair, it should be enforced.* (8 *Ves.* 163, 2 *Sch.* & *Lef.* 347, 352.   9 *Ves.* 608.)

I do not see any thing in this cause which looks like an a-bandonment of the contract. It is clearly distinguishable from the cases in 1 *Dessaussure,* 382, and 13 *Ves.* 238.   Here was no necessity for punctuality, as the parties had taken possession according to the contract.   Indeed, the state of *Ellison's* health was a sufficient excuse for not offering to convey at the day.   I am satisfied that the general rule is as laid down by the appellant's counsel ; and that this case does not come within the exceptions to it.

State of El-
lison's health
excused de-
fault to con-
vey at the day.

The cause must therefore be remitted to the Court of Chancery, that the Chancellor may direct a Master to in-quire whether the appellant can give to the respondents a clear and unincumbered title to the *Newburgh* lots ; and if he can, a decree for a specific performance, according to the contract, must be entered against the respondents.

Cause should
be remitted ;
master to in-
quire, &c and
if, &c. a per-
formance
should be de-
creed.

BOWMAN, BRONSON, BURROWS, BURT, CRAMER, DUDLEY, HAIGHT, LYNDE, M'INTYRE, REDFIELD, THORN, WHEELER and WOOSTER, Senators, concurred.

For affirming,
10—for rever-
sing, 14.

A majority of the Court being for a reversal, it was there-upon ORDERED, ADJUDGED and DECREED, that one of the Masters of the Court of Chancery be directed to inquire whether the said appellant has, and can give a good title to certain lands in the town of *Newburgh,* in the county of *Orange,* which, by certain articles of agreement set forth in the appellant's bill of complaint, and proved in the said cause, the said appellant had agreed to convey to the said *Thomas Ellison,* deceased, in his life time ; and if his Hon-our the Chancellor, upon the coming in of the report of the said Master, shall be of opinion that such title can be giv-en, that a proper decree be made for the specific perform-ance, by the appellant and the respondents, of the said arti-cles of agreement, and for the execution, by the proper par-ties, of all necessary conveyances, with suitable covenants for assuring the title, and requiring the appellant and res-pondents to procure all proper persons to join in such con-

veyance ; and that the respondents, in that case, pay to the
appellant his costs in the Court of Chancery, to be taxed ;
and it was further ordered that the record be remitted, &c。

N. B. SUTHERLAND, J. was absent, through indisposi‑
tion ; and took no part in deciding this, or any of the causes
during this session。